[No. 83640-0.   En Banc.]

Argued September 23, 2010.      Decided January 20, 2011.

THE STATE OF WASHINGTON, *Respondent*, v. DANNY JOE BARBER, JR., *Petitioner*.

*James L. Reese III*, for petitioner.

*Russell D. Hauge, Prosecuting Attorney*, and *Randall A. Sutton, Deputy*, for respondent.

¶1 STEPHENS, J. — We have recognized two possible remedies for an involuntary guilty plea: withdrawal of the plea or specific performance of the plea agreement. *See In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 303, 88 P.3d 390 (2004) (citing *State v. Turley*, 149 Wn.2d 395, 399, 69 P.3d 338 (2003)). The question in this case is whether a defendant is entitled to specific performance when the result is to bind the sentencing court to impose a sentence that is

contrary to law. Danny Joe Barber argues he is entitled to the sentence the parties agreed to in a plea agreement, though it failed to include a statutorily mandated term of community custody. He relies on our decision in *State v. Miller*, which states that "the specific terms of a plea agreement based on a mistake as to sentencing consequences may be enforced despite the explicit terms of a statute." 110 Wn.2d 528, 532, 756 P.2d 122 (1988) (citing *State v. Cosner*, 85 Wn.2d 45, 530 P.2d 317 (1975)). The Court of Appeals rejected Barber's argument, concluding that under *Miller* and other cases, specific performance entitles Barber to nothing more than a favorable recommendation from the State. *State v. Barber*, 152 Wn. App. 223, 228-29, 217 P.3d 346 (2009). Before this court, the State argues that, if *Miller* requires not merely a recommendation from the State but judicial enforcement of an illegal sentence, it should be overruled. We conclude that *Miller* does in fact hold a defendant is entitled to specific performance of an illegal sentence but that this holding is both incorrect and harmful. Accordingly, we overrule *Miller* and affirm the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶2 The State charged Barber by amended information with one count of felony DUI (driving under the influence) arising out of a hit-and-run incident in October 2007. Barber and the State entered into a plea agreement in which Barber agreed to plead guilty in exchange for the State's recommendation of a 51-month sentence to run concurrently with another conviction and that Barber receive credit for time served. The plea agreement form contained a box to note any recommendation regarding community custody, but it was left unchecked.

¶3 Before accepting Barber's plea, the court summarized the agreement as follows:

> You have entered into a plea agreement with the State of Washington. Pursuant to the plea agreement you have an

offender score of seven. The standard range is 51 to 68 months with a maximum of five years. The state is going to recommend 51 months to be served in the Department of Corrections, credit for any time served. They are also going to recommend this run concurrent with another cause number, 07-1-00683-2.

Verbatim Report of Proceedings (VRP) (Nov. 16, 2007) at 3-4. The court then asked whether community custody was required for the offense. Defense counsel responded, "I don't believe so, Your Honor. That is surprising to me as well." *Id.* at 4. The prosecutor said nothing.

¶4 Later, the State made its recommendation to the court:

> Your Honor, 51 months is the state's recommendation. We think it's fair given all the facts of this case. The standard range under the circumstances is 51 to 68. Since he's taken responsibility, we are recommending 51 months, and it is intended for that to run concurrent with his unlawful possession of a firearm case.

*Id.* at 5. The court followed the State's recommendation and sentenced Barber to 51 months of incarceration. *Id.* at 9.

¶5 Approximately 6 months later, the Department of Corrections notified the prosecutor's office that Barber's felony DUI offense carried a mandatory 9 to 18 month term of community custody. VRP (Apr. 25, 2008) at 2-3. The State moved to amend the judgment and sentence. At a hearing to consider the State's motion, the State and Barber agreed that the plea was invalid and that Barber was entitled to either withdraw the plea or seek specific performance. Barber chose specific performance. Both the State and Barber assumed that specific performance of the agreement required the State to make a recommendation for no community custody. They disputed, however, whether the court would be bound by the recommendation. The trial court issued a memorandum opinion concluding it was not bound by a recommendation from the State. At Barber's resentencing, the State recommended that the court not impose community custody, but the court declined to follow

the recommendation and imposed the statutorily mandated 9 to 18 month term of community custody. Barber appealed.

¶6 The Court of Appeals framed the issue as whether specific performance of the plea agreement required the trial court to follow the State's sentencing recommendation. *See Barber*, 152 Wn. App. at 225-27. The court cited several of our cases holding that specific performance requires the State to make its promised recommendation but that the trial court retains the discretion to ignore the recommendation. *Id.* at 227. Because the State made a recommendation for no community custody at resentencing, the Court of Appeals concluded that Barber received specific performance of the plea agreement. *Id.* at 229. The court affirmed the trial court's modification of the judgment and sentence. *Id.* We granted review. *State v. Barber*, 168 Wn.2d 1001, 226 P.3d 780 (2010).

## ANALYSIS

¶7 The State and Barber agree that he was not informed that a conviction for felony DUI carries a mandatory term of community custody. Thus, there is no dispute that Barber was misinformed as to a direct consequence of his plea and that the plea is invalid. *See generally Turley*, 149 Wn.2d at 399 (holding that failure to inform a defendant of mandatory community placement renders a guilty plea invalid). The dispute here focuses on the remedy. Relying on *Miller*, Barber argues that specific performance of the plea agreement entitles him to a sentence without community custody. The State makes two arguments in response. First, it contends that specific performance entitles Barber to nothing more than the State's recommendation of no community custody, which the trial court is free to reject. Second, if we conclude that specific performance under *Miller* entitles Barber to a sentence without the statutorily mandated term of community custody, the State asks this court to overrule *Miller* as "incorrect and harmful." *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970).

¶8 The Court of Appeals accepted the State's first position on the premise that the plea agreement called for a recommendation from the State against community custody. *Barber*, 152 Wn. App. at 225. The court reasoned that specific performance in such situations is satisfied when the State makes a sentencing recommendation consistent with the plea agreement. *Id.* at 227. Thus, it held Barber to his election of specific performance and affirmed the modification of his sentence to include community custody. *Id.* at 229. The court did not consider whether its understanding of specific performance differed from the view taken in *Miller*. *See id.* at 228. We believe it does.

¶9 Specific performance entitles a defendant to "the benefit of his original bargain." *State v. Tourtellotte*, 88 Wn.2d 579, 585, 564 P.2d 799 (1977). A plea agreement functions as a contract in which the defendant exchanges his guilty plea for some bargained-for concession from the State: dropping of charges, a sentencing recommendation, etc. *See State v. Sledge*, 133 Wn.2d 828, 838-40, 947 P.2d 1199 (1997); *State v. Hunsicker*, 129 Wn.2d 554, 559, 919 P.2d 79 (1996). Specific performance ensures that the defendant receives the promise he bargained for.

¶10 Specific performance of a plea agreement arises in two main contexts: breach of the plea agreement by the prosecutor and mutual mistake by both parties (and the court) as to the consequences of the plea. A breach occurs when the State promises, for example, to recommend or not recommend a particular sentence or to file or drop certain charges, and then fails to keep its promise. If the defendant elects specific performance as a remedy, the State is compelled to make the bargained-for sentencing recommendation or charging decision. *See, e.g.*, *State v. Harrison*, 148 Wn.2d 550, 559, 61 P.3d 1104 (2003).

¶11 The second context for specific performance is that of mutual mistake or reliance on misinformation, where the State and the defendant stipulate in the plea agreement to a sentence that is contrary to law. The parties may agree, for example, that an offense carries a mandatory minimum term

of 10 years, when in reality, the mandatory minimum term is 20 years. If the defendant elects specific performance in this context, giving him the benefit of the plea bargain would require imposing the bargained-for sentence.[1]

¶12 As *Miller* recognized, taken to its logical conclusion, specific performance in the context of a mutual mistake may require enforcement of a sentence that is contrary to law. In *Miller*, the defendant pleaded guilty to first degree murder, which carried a standard range sentence between 20 and 30 years. When Miller entered his plea, he was advised by his attorney, who was in turn advised by the prosecutor, that he would be able to argue for an exceptional sentence of 15 years. The parties were unaware that a conviction of first degree murder actually required a mandatory minimum term of 20 years. Three months after pleading guilty, but before sentencing, Miller learned about the 20-year mandatory minimum sentence and moved to withdraw his plea. The trial court denied the motion and ordered that the plea agreement be specifically enforced according to its terms—that Miller be allowed to argue for an exceptional sentence of 15 years despite the 20-year statutory minimum sentence. On review, Miller maintained that withdrawal of the plea was the only appropriate remedy because specific performance could not require the trial court to impose an illegal sentence.[2]

---

[1] There are certainly hybrid situations involving both breach of a plea agreement and mutual mistake. The State might agree, for example, to recommend a sentence of 26 months believing that the standard range is 26 to 34 months, when the standard range is actually 41 to 54 months. *See, e.g., State v. Henderson*, 99 Wn. App. 369, 371, 993 P.2d 928 (2000). Specific performance in this situation—like in the pure breach context—entitles the defendant to only the State's recommendation, not to enforcement of the illegal sentence. *See State v. Walsh*, 143 Wn.2d 1, 9 n.4, 17 P.3d 591 (2001).

[2] *Miller* was actually a hybrid case because the agreement called for a recommendation (from Miller) that was contrary to law. Specific performance in this context arguably could have required only that Miller be allowed to make his recommendation, without obligating the court to accept it. (In fact, Miller's counsel refused to argue for the illegal 15-year sentence despite the trial court's decision to consider it.) However, the court's discussion of specific performance in *Miller*

¶13 We disagreed with Miller's contention that withdrawal of the plea was the only available remedy. We said, "[W]here fundamental principles of due process so dictate, the specific terms of a plea agreement based on a mistake as to sentencing consequences may be enforced despite the explicit terms of a statute." *Miller*, 110 Wn.2d at 532 (citing *Cosner*, 85 Wn.2d 45). We explained that a "court is not absolutely bound by the statutory mandatory minimum where it conflicts with the terms of a plea agreement," *id.* (citing *In re Pers. Restraint of Williams*, 21 Wn. App. 238, 583 P.2d 1262 (1978)), and that "[d]efendants' constitutional rights under plea agreements take priority over statutory provisions," *id.* at 533 (citing *In re Pers. Restraint of James*, 96 Wn.2d 847, 849, 640 P.2d 18 (1982)). Recognizing that enforcement of an illegal sentence would necessarily require the trial court to be bound by the parties' agreement, we further explained that "once the court has accepted the plea, it cannot ignore the terms of the bargain." *Id.* at 536. We concluded that both withdrawal and specific performance were available remedies and that "the defendant's choice of remedy controls, unless there are compelling reasons not to allow that remedy." *Id.* at 535.

¶14 *Miller* was a 5-4 decision, with the concurrence criticizing the majority for requiring "an impossible result." *Id.* at 538 (Durham, J., concurring). Emphasizing separation of powers concerns, the concurrence stated, "There simply is no credible legal argument that can be made for the proposition that a court—or, as in *Cosner*, another sentencing agency—may exceed its statutory sentencing authority in order to enforce the terms of a plea agreement." *Id.* Reading the concurring and majority opinions together, there is little doubt that the holding in *Miller* contemplates a notion of specific performance that is much broader than the Court of Appeals below appreciated.

¶15 The State concedes that *Miller* allows Barber to elect specific performance and that the terms of the plea agree-

assumed that specific performance would have required binding the trial court to violate the statute, and it is thus framed as a mutual mistake case.

ment unambiguously call for a sentence without community custody. *Cf. State v. Bisson*, 156 Wn.2d 507, 523-24, 130 P.3d 820 (2006) (explaining that terms of a plea agreement must be unambiguous to be specifically enforced). The State also concedes that it agreed to this illegal sentence with Barber by mutual mistake. It nonetheless tries to distinguish *Miller*, arguing that specific performance entitles Barber to only the State's recommendation for no community custody, without restricting the trial court's prerogative to reject that recommendation and impose community custody. The State, in essence, equates the situation to one involving a breach, where specific performance is satisfied when the State makes its promised recommendation. As noted, the Court of Appeals adopted the State's position on the belief that the terms of the plea agreement required a recommendation against community custody.

¶16 The State would be correct in its analysis if Barber had in fact exchanged his guilty plea for merely a *recommendation* of no community custody. *Cf. In re Pers. Restraint of Powell*, 117 Wn.2d 175, 199, 814 P.2d 635 (1991) (noting that in the breach context "specific performance of the plea bargain only requires that the prosecutor recommend what he or she agreed to recommend"). But Barber exchanged his guilty plea for a sentence that did not include any term of community custody. This distinction matters because it goes to the heart of specific performance as a remedy: specific performance gives the defendant the benefit of his bargain, i.e., a promised recommendation or a promised sentence. Here, under the section of the plea agreement entitled "Sentencing Recommendations and Agreements," there is no notation about a recommendation for or against community custody. Clerk's Papers at 19. While the plea form contains a box for community custody, it was left unchecked. *Id.*

¶17 We do not construe the absence of any mention of community custody in the plea agreement as a promise from the State to recommend against community custody. Instead, we recognize it as reflecting the parties' mistaken

understanding that community custody was not a component of Barber's sentence. This mistaken understanding is further evidenced by the exchange between the trial court and Barber's counsel at sentencing. VRP (Nov. 16, 2007) at 3-4. The parties' agreement for a sentence that is contrary to law brings the case squarely within the context of mutual mistake. In this context, *Miller* dictates that specific performance of the agreement would require the court to impose the bargained-for sentence—a sentence without the statutorily mandated term of community custody.

¶18 Recognizing the import of *Miller*, the State asks that we reconsider our decision. This is an invitation we do not take lightly. *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). "[W]e endeavor to honor the principle of stare decisis, which 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Keene v. Edie*, 131 Wn.2d 822, 831, 935 P.2d 588 (1997) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 115 L. Ed. 2d 720, *reh'g denied*, 501 U.S. 1277, 112 S. Ct. 28, 115 L. Ed. 2d 1110 (1991)). Yet we have recognized that "courts must have and exert the capacity to change a rule of law when reason so requires." *Stranger Creek*, 77 Wn.2d at 653. " 'Reluctant as we are to depart from former decisions, we cannot yield to them, if, in yielding, we perpetuate error and sacrifice principle.' " *Keene*, 131 Wn.2d at 831 (quoting *deElche v. Jacobsen*, 95 Wn.2d 237, 247, 622 P.2d 835 (1980)). These considerations have led us to require "a clear showing that an established rule is incorrect and harmful before it is abandoned." *Stranger Creek*, 77 Wn.2d at 653.

¶19 While our decisions reflect the requisite showing to be that of "incorrect and harmful," we have not expanded in great detail on the meaning of this standard. *See State v. Ray*, 130 Wn.2d 673, 677, 926 P.2d 904 (1996) ("This court has infrequently discussed under what conditions it should disregard the doctrine of stare decisis and overturn an established rule of law."). Before addressing the continued

vitality of *Miller*, it is therefore helpful to clarify the nature of the "incorrect and harmful" analysis.

¶20 Some of our prior cases have articulated the standard in the disjunctive, requiring a showing that the decision be "incorrect or harmful." *See, e.g., Ray*, 130 Wn.2d at 679. Our more recent cases, however, adhere to the conjunctive form. *See, e.g., City of Federal Way v. Koenig*, 167 Wn.2d 341, 346, 217 P.3d 1172 (2009) (citing *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004)); *see also State v. Stalker*, 152 Wn. App. 805, 811-12 n.1, 219 P.3d 722 (2009) (collecting cases and noting inconsistency between the use of the disjunctive and conjunctive forms). And requiring a party to make both showings is consistent with our first articulation of the standard in *Stranger Creek*. 77 Wn.2d at 653. We therefore reaffirm the standard as originally stated to require a showing that the decision to be overruled is both incorrect *and* harmful.

¶21 The meaning of "incorrect" is not limited to any particular type of error. We have recognized, for example, that a decision may be considered incorrect based on inconsistency with this court's precedent, *see State v. Baldwin*, 150 Wn.2d 448, 460-61, 78 P.3d 1005 (2003); inconsistency with our state constitution or statutes, *see State v. Devin*, 158 Wn.2d 157, 168-69, 142 P.3d 599 (2006); or inconsistency with public policy considerations, *see Keene*, 131 Wn.2d at 834. A decision may also be incorrect if it relies on authority to support a proposition that the authority itself does not actually support. *See Stranger Creek*, 77 Wn.2d at 654 (noting that the prior decision misinterpreted a constitutional provision). While our cases reflect a fairly inclusive understanding of "incorrect," we have at times rejected invitations to overrule prior decisions based on arguments that were adequately considered and rejected in the original decisions themselves. *Key Design, Inc. v. Moser*, 138 Wn.2d 875, 883, 983 P.2d 653 (1999) (noting the various complaints against the decision were "not new" and had already been "considered and rejected"); *Brower v. State*, 137 Wn.2d 44, 75, 969 P.2d 42

(1998) (explaining that a case is not lightly overturned where "the varying views on the issue [were] thoroughly explored in the case"); *Brutsche v. City of Kent*, 164 Wn.2d 664, 682, 193 P.3d 110 (2008) (rejecting a challenge based on "the same arguments that were thoroughly considered and decided" in the original case).

¶22 A decision may be "harmful" for a variety of reasons as well. In *Devin*, we found one of our early 20th century precedents harmful where its application denied compensation to crime victims contrary to more recent changes in constitutional and statutory law. 158 Wn.2d at 170-71. In *Baldwin*, we found a prior decision harmful where its application would have "turn[ed] every guideline [sentence] into a constitutionally protected liberty interest." 150 Wn.2d at 461. And in *Stranger Creek*, a long standing precedent was deemed harmful where it would have destroyed the public benefit in the best use of the State's trust lands. 77 Wn.2d at 657. Although the harm in each of these cases was specific to the facts before us, the common thread was the decision's detrimental impact on the public interest.

¶23 The above examples are certainly not exclusive. Nor do they represent factors or requirements for showing that a decision is incorrect and harmful. They are helpful, nonetheless, in providing a general direction for our analysis. With these considerations in mind, we turn now to the question of whether *Miller* is both incorrect and harmful.

1. Is *Miller* incorrect?

■ ¶24 Prior to *Miller*, specific performance was recognized as an available remedy only in the context of a prosecutor's breach of the plea agreement. *See Miller*, 110 Wn.2d at 534. The notion that the State must be held to its promises through specific performance of the agreement can be traced to *Santobello v. New York*, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971). *Santobello* was a breach case. The defendant pleaded guilty in exchange for the prosecutor's promise to make no recommendation about

sentencing. Following several delays, a sentencing hearing was held before a different judge and with a new prosecutor representing the State. The new prosecutor, unaware of the earlier promise, breached the plea agreement by recommending that the court impose the maximum sentence, which the court did.

¶25 On review, the United States Supreme Court took the opportunity for the first time to approve of the plea bargaining process generally. *Id.* at 260-61; *see Blackledge v. Allison*, 431 U.S. 63, 76, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977) (explaining that prior to *Santobello*, plea bargaining was "a *sub rosa* process shrouded in secrecy and deliberately concealed by participating defendants, defense lawyers, prosecutors, and even judges"). The Court explained that the fairness of the process was secured, in part, by the requirement that the State adhere to its promises in the plea agreement. *Santobello*, 404 U.S. at 261-62. If the State reneged, the remedy was to allow either specific performance of the agreement or withdrawal of the plea. *Id.* at 263. Justice Douglas, in a concurrence, opined that election of the appropriate remedy rested with the defendant: "[A] court ought to accord a defendant's preference considerable, if not controlling, weight inasmuch as the fundamental rights flouted by a *prosecutor's breach of a plea bargain* are those of the defendant, not of the State." *Id.* at 267 (Douglas, J., concurring) (emphasis added).

¶26 This court in *Miller* recognized that *Santobello* was a breach case but nonetheless decided to extend *Santobello* to the context of mutual mistake. *Miller*, 110 Wn.2d at 534 ("Although this case does not involve a prosecutor's deliberate breach of a plea agreement, the defendant's preference as to remedy should be the primary focus of the court."). Whereas a defendant was previously limited to withdrawal of his plea when it contained an agreement for an illegal sentence, *Miller*'s extension of *Santobello* allowed a defendant to elect specific performance and have an illegal sentence enforced.

¶27 *Miller* justified this extension of *Santobello* on due process grounds, relying mainly on *Cosner* for the notion that a defendant has a due process right to enforcement of an illegal sentence. *Miller*, 110 Wn.2d at 532 (quoting *Cosner*, 85 Wn.2d at 51-52). While this reading of *Cosner* is understandable, we believe it goes too far. A careful reading of *Cosner* reveals that the sentence imposed in that case was not illegal at all and that due process therefore did not authorize the violation of a sentencing statute.

¶28 In *Cosner*, three defendants—Cosner, Cramer, and Christian—pleaded guilty in separate proceedings to offenses that carried the possibility of enhanced penalties under the deadly weapon statute, former RCW 9.95.040 (1961). The deadly weapon statute required the Board of Prison Terms and Parole to set mandatory minimum sentences based on a court's special finding that the crime was committed with a deadly weapon. For a first offense, the mandatory minimum was five years; for any subsequent offense, the mandatory minimum was seven and one-half years. Defendant Cosner pleaded guilty with the understanding that he would receive a minimum sentence of seven and one-half years. Defendants Cramer and Christian, however, pleaded guilty under the mistaken belief that they would receive a mandatory minimum term of five years, when in fact a longer-term enhancement should have applied. Upon arriving at the correctional facility, the Board imposed the required term of seven and one-half years on Cramer and Christian.

¶29 All three defendants challenged the validity of their pleas, contending that they received inadequate notice of the enhanced penalties under the deadly weapon statute. We cited several of our previous cases establishing a due process rule applicable to the State's use of the sentencing enhancements under the deadly weapon statute. The rule precluded the State from relying on the enhanced penalties unless there was notice to the defendant of such penalties in the charging instrument. We explained that where adequate notice was not provided, the enhanced penalty provisions of the statute could not be applied to the defendant.

¶30 Turning to the facts in the case, we observed that the State had failed to give notice of its reliance on the deadly weapon statute when charging the defendants. We nonetheless concluded that "the rigidity of the rule," *Cosner*, 85 Wn.2d at 51, should not entirely preclude reliance on the deadly weapon statute under the particular facts of the case: each defendant had committed the crime with a deadly weapon; each was represented by competent counsel; and each had notice at the time of pleading guilty that enhanced penalties were possible because of their use of a deadly weapon. We therefore concluded that due process allowed the State to rely on the deadly weapon statute—despite the failure to give notice in the charging instrument—because the defendants had otherwise received adequate notice.

¶31 We dismissed Cosner's claim because he had not only received notice of the State's reliance on the deadly weapon statute, but he had also been properly informed of the applicable enhanced penalty: seven and one-half years. In contrast, we noted that although Cramer and Christian were informed of the possibility of enhanced penalties under the deadly weapon statute, they were not given adequate notice as to the applicable penalty, but rather were misinformed they would receive an enhanced sentence of only five years. We accordingly granted their personal restraint petitions "to the extent that the Board of Prison Terms and Paroles [was] directed to reduce their mandatory minimum terms [(seven and one-half years)] in accordance with their understanding of the length thereof at the time of their pleas [(five years)]." *Id.* at 51-52.

¶32 The *Miller* court read this portion of *Cosner* as directing the Board to enforce a sentence in violation of the deadly weapon statute. *See Miller*, 110 Wn.2d at 532. But the court in *Cosner* did not mandate a sentence in violation of the deadly weapon statute at all. Instead, under the due process rule at issue in *Cosner*, the deadly weapon statute's

enhanced penalty of seven and one-half years simply did not apply to Cramer and Christian. The State was, in effect, precluded from relying on the seven and one-half year enhancement, as it had failed to give notice of that penalty to Cramer and Christian. Because the defendants *did* have notice of the five-year enhancement, due process did not prevent the State from relying on that enhancement. And because Cosner had received notice of the seven and one-half year enhancement, due process did not prevent the State from relying on the seven and one-half year enhancement in his case. To the extent due process directed the remedy in *Cosner*, it operated to make a portion of the deadly weapon statute inapplicable to Cramer and Christian—not to authorize a violation of the statute. Thus, we must conclude that *Miller* misread *Cosner* when it held that a defendant has a due process right to enforcement of an agreed-upon sentence that is contrary to law.[3]

¶33 The *Miller* court also relied upon *Tourtellotte* for the proposition that the court is bound by the parties' agreement for a particular sentence once the court has accepted the plea. *See Miller*, 110 Wn.2d at 536 ("We here reaffirm *Tourtellotte*, and hold that . . . once the court has accepted the plea, it cannot ignore the terms of the bargain . . . ."). In *Tourtellotte*, the defendant pleaded guilty to second degree arson in exchange for the State's promise to not file charges for larceny. At sentencing, and after receiving complaints from the arson victims, the State breached the agreement by moving to have the defendant's guilty plea withdrawn. Over the defendant's objection, the court granted the motion and the State proceeded to trial on the arson charge. After the arson charge was dismissed on other grounds, the State charged the defendant with larceny. On review, we explained that "[a] plea bargain is a binding agreement

---

[3] The concurrence in *Miller* agreed with the majority's reading of *Cosner* as allowing the court to enforce a sentence that violated the sentencing statute. *Miller*, 110 Wn.2d at 538 (Durham, J., concurring). Our analysis here therefore raises a concern that was not considered and rejected in *Miller*. *Cf. Brutsche*, 164 Wn.2d at 682 (refusing to overrule a case based on "the same arguments that were thoroughly considered and decided" in the original case).

between the defendant and the State which is subject to the approval of the court" and that "[a]n agreement between the parties which is approved by the trial judge cannot be turned aside simply because of the exigencies of the moment." *Tourtellotte*, 88 Wn.2d at 584. Concluding that specific performance of the agreement was the appropriate remedy for the State's breach, we remanded with the instruction to reinstate the guilty plea to second degree arson and to dismiss the larceny charge.

¶34 The holding in *Tourtellotte* was narrow: the trial court erred by granting the State's motion to have the defendant's guilty plea withdrawn. *Miller* wrongly relied on *Tourtellotte* to support the broader proposition that the court is bound to impose a sentence consistent with the parties' plea agreement.

¶35 We must also consider whether *Miller* is incorrect insofar as it is inconsistent with the general limitations on a court's sentencing authority. We have often recognized that, where a defendant enters into a plea agreement for a sentence in excess of what is statutorily authorized, the sentence is unenforceable. *See, e.g., In re Pers. Restraint of Moore*, 116 Wn.2d 30, 38, 803 P.2d 300 (1991) ("[T]he actual sentence imposed pursuant to a plea bargain must be statutorily authorized; a defendant cannot agree to be punished more than the Legislature has allowed for."). If a plea agreement cannot bind the court to impose greater punishment than is statutorily authorized, it follows that the court lacks authority to impose lesser punishment as well. Moreover, the inability of the parties' agreement to alter the court's sentencing authority comports with the general notion that the court is not bound by a party's erroneous concession on a matter of law. *State v. Knighten*, 109 Wn.2d 896, 902, 748 P.2d 1118 (1988). It is also supported by the principle of contract law that "[a] contract in conflict with statutory requirements is illegal and unenforceable as a matter of law." *Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 499, 886 P.2d 147 (1994) (citing *Hederman v. George*, 35 Wn.2d 357, 362, 212

P.2d 841 (1949)). Because *Miller* is inconsistent with these notions of the court's sentencing authority and the parties' inability to alter that authority, we conclude that *Miller* is incorrect.

## 2. Is *Miller* harmful?

¶36 It is not enough that a decision is incorrect for us to overrule it; we must also find that it is harmful. We conclude that *Miller* is harmful because it undermines the main purposes of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, and it risks offending the separation of powers doctrine.

¶37 As to the first reason, the primary purposes for enacting the SRA were "to create more certainty and uniformity in sentencing, to make sentencing more dependent upon the crime committed and criminal history of the offender, and to reduce the discretion of trial judges." *In re Pers. Restraint of LaChapelle*, 153 Wn.2d 1, 6, 100 P.3d 805 (2004) (citing David Boerner & Roxanne Lieb, *Sentencing Reform in the Other Washington*, 28 CRIME & JUST. 71, 84-87 (2001)). Requiring the courts to enforce illegal sentences seriously undermines the goal of uniformity and consistency in sentencing that gave rise to the SRA. Lower courts have recognized this as an implication of the specific-performance remedy under *Miller*. *See, e.g., In re Pers. Restraint of Hoisington*, 99 Wn. App. 423, 434-35, 993 P.2d 296 (2000) (noting that application of *Miller* would allow a defendant to reduce a statutorily mandated life sentence to a 10-year maximum sentence). *Miller*'s tendency to undermine uniformity and consistency in sentencing illustrates its harmful effect.

¶38 *Miller* is also harmful when considered in light of the doctrine of separation of powers. While our constitution does not contain a formal separation of powers clause, "the very division of our government into different branches has been presumed throughout our state's history to give rise to a vital separation of powers doctrine." *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994) (citing *In re Salary of*

*Juvenile Dir.*, 87 Wn.2d 232, 238-40, 552 P.2d 163 (1976)). "The doctrine serves mainly to ensure that the fundamental functions of each branch remain inviolate." *Id.* Yet it "rarely will offer a definitive boundary beyond which one branch may not tread." *Id.* (citing *Juvenile Dir.*, 87 Wn.2d at 240). To determine whether a particular action violates separation of powers, we look " 'not [to] whether two branches of government engage in coinciding activities, but rather whether the activity of one branch threatens the independence or integrity or invades the prerogatives of another.' " *Id.* (quoting *Zylstra v. Piva*, 85 Wn.2d 743, 750, 539 P.2d 823 (1975)).

¶39 The specific performance remedy recognized in *Miller* threatens separation of powers in at least two ways. First, it allows the prosecutor, as a member of the executive branch, to bind the court to a particular sentence through the plea agreement. This invades the court's prerogative to impose what it considers to be an appropriate sentence in the case before it. Second, *Miller* potentially requires the court to enforce a sentence outside the parameters authorized by the legislature. While the court may exercise its discretion in sentencing, it must do so within the bounds of the sentencing laws. *State v. Manussier*, 129 Wn.2d 652, 667-68, 921 P.2d 473 (1996) (citing *State v. Ammons*, 105 Wn.2d 175, 181, 713 P.2d 719, 718 P.2d 796 (1986)). By enforcing a sentence outside such bounds, the court would be invading the legislature's prerogative.[4]

¶40 We hold that *Miller* is both incorrect and harmful to the extent it allows specific performance of a plea agree-

---

[4] In *In re Postsentence Review of Hudgens*, Division Three of the Court of Appeals held that enforcement of an illegal sentence does not offend separation of powers. 156 Wn. App. 411, 420-21, 233 P.3d 566 (2010). The court explained that this conclusion followed from the trial court's "inherent power to enforce a plea agreement so as to preserve the defendant's constitutional rights." *Id.* at 421 (citing *State v. Breazeale*, 144 Wn.2d 829, 839-40, 31 P.3d 1155 (2001)). This proposition from *Breazeale* can ultimately be traced back to *Miller*'s erroneous premise that a defendant has a due process right to enforcement of an illegal sentence. *Breazeale*, 144 Wn.2d at 839-40 (citing *State v. Shineman*, 94 Wn. App. 57, 62-63, 971 P.2d 94 (1999) (citing *Miller*, 110 Wn.2d at 532)). In overruling *Miller*, we reject that premise.

ment to bind the court to enforce an illegal sentence. Accordingly, we overrule this aspect of *Miller* and hold that specific performance is not an available remedy in cases of mutual mistake. Where the parties have agreed to a sentence that is contrary to law, the defendant may elect to withdraw his plea. While withdrawal may not return the defendant to the precise status quo ante in every circumstance, it is the only remedy the court has authority to impose. The remedy of specific performance was intended to address the State's breach of a plea agreement, *see Santobello,* 404 U.S. at 257-58, and is not appropriately extended to the mutual-mistake context.

¶41 Our decision should not be read as a criticism of specific performance. When the State reneges on its promised recommendation or charging decision, specific performance remains an appropriate remedy. Specific performance as a remedy for breach of the plea agreement ensures that the State follows through with its promises, and it thus acts as a deterrent against a prosecutor " 'play-[ing] fast and loose with an accused's constitutional rights.' " *Tourtellotte,* 88 Wn.2d at 585 (quoting *Courtney v. State,* 1959 OK CR 76, 341 P.2d 610, 612). The same deterrent purpose is not present where the parties agree to an illegal sentence by mutual mistake. Moreover, specific performance in the breach context has the effect of simply binding the State to its promises, which does not raise the same concerns as specific performance in the context of mutual mistake—namely, binding the trial court to an illegal sentence. Thus, in the breach context, our precedent allows a defendant to elect either specific performance or withdrawal of the plea, subject to compelling reasons not to allow the chosen remedy.

## CONCLUSION

¶42 We affirm the Court of Appeals and hold that Barber is not entitled to specific performance of a plea agreement term that is contrary to law. In so holding, we overrule our

prior decision in *Miller* to the extent it allows specific performance of an illegal sentence. We limit the remedy of specific performance to the situation in which the State breaches its promise to make a specific charging decision or recommendation to the sentencing court.

MADSEN, C.J.; C. JOHNSON, ALEXANDER, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ.; and SANDERS, J. PRO TEM., concur.

Reconsideration denied August 3, 2011.