YU, J. (concurring in part and dissenting in part)
¶450 The majority of this court correctly concludes that petitioner Conner Michael Schierman's convictions should be affirmed, and this opinion fully concurs with the opinion of Justice Gordon McCloud regarding the guilt phase of Schierman's trial.
¶451 However, the trial court did not err in its evidentiary rulings at the penalty phase and Schierman's sentence is not statutorily disproportionate. I therefore respectfully dissent in part for the reasons expressed below.
*1153 *764 ANALYSIS
A. Schierman's convictions are properly affirmed
¶452 Justice Gordon McCloud's opinion correctly analyzes and decides the issues relating to the guilt phase of Schierman's trial. By further discussing the de minimis standard that a majority of this court now adopts for reviewing alleged public trial right violations, this opinion does not intend to imply any inconsistency between itself and the opinion of Justice Gordon McCloud on that issue. See lead opinion at 1079-83.
¶453 1. Our prior rejection of de minimis closures is incorrect and harmful Stare decisis plays a critical role in our justice system by " ' "promot[ing] the evenhanded, predictable, and consistent development of legal principles, foster[ing] reliance on judicial decisions, and contribut[ing] to the actual and perceived integrity of the judicial process." ' " State v. Barber, 170 Wash.2d 854, 863, 248 P.3d 494 (2011) (quoting Keene v. Edie, 131 Wash.2d 822, 831, 935 P.2d 588 (1997) (quoting Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) )). There is perhaps no context in which these concerns are more salient than in the judicial interpretation and application of constitutional rights. The decision to disavow our constitutional precedent is a weighty one, which must be accompanied by a full and honest account of the reasons that our precedent is " 'incorrect and harmful.' " Id. (quoting In re Rights to Waters of Stranger Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970) ).
a. Our precedent is incorrect because it misapprehends the nature of a de minimis inquiry
¶454 Our precedent rejects the possibility of a de minimis closure and instead assumes that every closure not *765 justified by a Bone-Club[1] analysis on the record, no 1 matter how trivial, violates the public trial right and requires automatic reversal as structural error. This precedent is incorrect because it is based on the assumption that in order to determine whether a closure is de minimis, we would be required to determine whether the closure caused prejudice to the defendant. State v. Shearer, 181 Wash.2d 564, 573, 334 P.3d 1078 (2014) (Owens, J., lead opinion) ("recognizing de minimis violations based on the lack of prejudice to the defendant would conflict with our precedent that public trial rights violations are structural errors and not subject to a harmlessness analysis" (emphasis added)). However, a de minimis inquiry does not require any analysis of whether there was prejudice to the defendant. Instead, a de minimis inquiry considers whether the values underlying the public trial right have been undermined.
¶455 Our precedent is unquestionably correct that it is usually impossible to determine whether structural error has resulted in prejudice to a particular defendant. In most cases, structural errors " 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' " United States v. Gonzalez-Lopez, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ). In proceedings infected by structural error, there are no untainted proceedings to use as a comparison point for determining whether the error was harmless. Sullivan v. Louisiana, 508 U.S. 275, 280, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Therefore, "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." Gonzalez-Lopez, 548 U.S. at 150, 126 S.Ct. 2557.
¶456 Our precedent is also correct that public trial violations are properly classified as structural error, even *766 though "in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." Weaver v. Massachusetts, 582 U.S. ----, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017). Therefore, if a de minimis inquiry did consider whether an unjustified closure caused prejudice to the defendant, our precedent would be correct in rejecting it.
¶457 However, a properly conducted de minimis inquiry is entirely unrelated to any showing of prejudice or lack of prejudice to *1154 the defendant. Instead, as explained by a seminal federal case,
[A] triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury," It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant-whether otherwise innocent or guilty-of the protections conferred by the Sixth Amendment.
Peterson v. Williams, 85 F.3d 39, 42 (2d Cir.) (emphasis added), cert. denied, 519 U.S. 878, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).[2] The test adopted by the Second Circuit in Peterson considers the specific facts of an unjustified closure to determine whether the closure undermined "the values furthered by the public trial guarantee." Id. at 43. If so, then there was a public trial violation regardless of whether there was prejudice to the defendant. Id. at 42.
¶458 Our precedent is thus incorrect because it rejects the possibility of a de minimis closure based on a misunderstanding of what it means.
*767 b. Our precedent is harmful because it requires automatic reversal based on de minimis closures
¶459 Our rigid treatment of every courtroom closure not preceded by a Bone-Club analysis as a public trial violation amounting to structural error requiring automatic reversal is clearly harmful. It
leads to delayed justice and additional costs, not all of which are quantifiable but which are nevertheless onerous. These can include the time and effort of the courts, the prosecuting agencies, and the defense attorneys, often public defenders, who must retry the cases; the burdens, including possible distress and anxiety, placed on another jury; the burdens placed on victims and other witnesses who must go through the process of another trial; the losses in relevant evidence that come with long-delayed presentation, when witnesses' memories are not as clear as at the time of the original trial; and the dollar costs of the new trials.
State v. Sublett, 176 Wash.2d 58, 103, 292 P.3d 715 (2012) (Madsen, C.J., concurring). Such costs and burdens are, of course, often implicated when any criminal conviction is reversed. But the harms resulting from our inflexible approach to public trial issues simply cannot be justified in light of the flawed reasoning underlying our rejection of the possibility of de minimis closures in which the public trial right was not actually violated.
¶460 This case is certainly not the first one in which it has been pointed out that our public trial jurisprudence is incorrect and harmful. See, e.g., State v. Njonge, 181 Wash.2d 546, 563, 334 P.3d 1068 (2014) (Gonzalez, J., concurring); State v. Smith, 181 Wash.2d 508, 533-38, 334 P.3d 1049 (2014) (Wiggins, J, concurring); Sublett, 176 Wash.2d at 114-28, 292 P.3d 715 (Madsen, C.J., concurring); State v. Paumier, 176 Wash.2d 29, 43-57, 288 P.3d 1126 (2012) (Wiggins, J., dissenting). However, this case perfectly illustrates why we must now disavow it. A majority of this court agrees that justice demands we affirm Schierman's convictions, but a differently *768 comprised majority of this court unanimously agrees that our precedent precludes us from doing so. In this direct conflict between justice and precedent, justice must prevail.
2. We adopt the de minimis inquiry established by federal appellate courts
¶461 Because our precedent is incorrect and harmful, a majority of this court now disavows it and adopts "the wise and widely-accepted Peterson test ... [t]o determine whether a closure was too trivial to implicate the Sixth Amendment guarantee" to a public trial. United States v. Ivester, 316 F.3d 955, 960 (9th Cir. 2003) (citing Braun v. Powell, 227 F.3d 908, 919 (7th Cir. 2000) ; United States v. Al-Smadi, 15 F.3d 153, 154-55 (10th Cir. 1994) ); see lead opinion at 1081-82. Determining whether a closure was de minimis *1155 requires the court to carefully consider the specific facts surrounding the closure and to determine whether, in light of those facts, the purposes of the public trial right were undermined. Peterson, 85 F.3d at 42-44.
¶462 To a limited extent, this test for de minimis closure resembles the logic prong of the experience and logic test, as both consider the purposes underlying the public trial right. See State v. Russell, 183 Wash.2d 720, 732, 357 P.3d 38 (2015). However, the logic prong uses a categorical, forward-looking approach that considers the purposes of the public trial right in order to determine whether the type of proceeding at issue implicates the public trial right. Id. at 730, 357 P.3d 38. The test for de minimis closure, meanwhile, uses a case-by-case, backward-looking approach that assumes the public trial right is implicated by the proceeding, and then asks whether, in light of the particular facts presented in the individual case, an unjustified closure actually undermined those purposes. Peterson , 85 F.3d at 42.
¶463 The de minimis test thus does not degrade the public trial right or encourage closed proceedings because it can never exempt an entire category of proceedings from the presumption that all proceedings must occur in open *769 court. It is merely an analytical tool applied on review that will always depend on the particular circumstances presented. This must be so because no two trials are identical and no trial is perfect. "[A] trial is a uniquely human affair and can be only as flawless as the judges and lawyers who conduct it. We strive for perfection but rarely attain it. Humans are imperfect." Paumier, 176 Wash.2d at 44, 288 P.3d 1126 (Wiggins, J., dissenting).
3. In this case, the closure of discussions regarding for-cause challenges was de minimis
¶464 As stated above, the test for whether an unjustified courtroom closure is de minimis is whether, in light of the specific facts appearing in the record, the closure actually undermined the purposes of the public trial right.[3] Peterson, 85 F.3d at 43. These purposes are well established: " 'to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury.' It also affirms the legitimacy of the proceedings and promotes confidence in the judiciary." In re Det. of Morgan, 180 Wash.2d 312, 325, 330 P.3d 774 (2014) (citation omitted) (quoting Sublett, 176 Wash.2d at 72, 292 P.3d 715 ).
¶465 To determine whether these purposes were in fact undermined under the circumstances presented, we must carefully consider the record. In making this determination, courts may look to the length of time the courtroom was closed, the reason the courtroom was closed, whether the public actually learned what occurred during the closed proceeding, and whether the closed proceedings related to the ultimate question of guilt or innocence. See Ivester, 316 F.3d at 960 ; Braun, 227 F.3d at 919 ;
*770 Peterson, 85 F.3d at 43-44. However, no single factor is either necessary or sufficient. "[T]he methodology employed by the trial court must be the focal point of appellate review." Braun, 227 F.3d at 918.
¶466 Here, the only proceedings relating to for-cause challenges that occurred in chambers were brief arguments by the parties (many of which had already been made in open court the day before) and the court announcing its decisions (which were repeated in open court immediately afterward). See Verbatim Report of Proceedings (VRP) (Jan. 11, 2010) at 263-67; VRP (Jan. 12, 2010) at 16-22, 42. Encouraging witnesses to come forward and discouraging perjury were not implicated, and given how brief the closure was as compared to the entire voir dire process (to say nothing of the entire trial process), it cannot be said the closure, in itself, actually undermined the purposes of the public trial right. VRP (Jan. 12, 2010) at 16 (estimating the in-chambers proceedings would take "less than ten minutes"). And *1156 while the closure was not inadvertent, the court here clearly had no intention of shielding either counsels' arguments or its own decisions from public scrutiny-a complete record of the proceedings was contemporaneously transcribed by a court reporter and is publicly available. Id. This served to remind the participants of their functions and responsibilities at the time, and to affirm the legitimacy of the proceedings going forward.
¶467 Courtroom closures not justified by a Bone-Club analysis are never advisable, but that does not mean they are always structural error requiring automatic reversal either. In this case, the closure was de minimis and did not violate the public trial right. Therefore, in accordance with the lead opinion, Schierman's convictions are affirmed.
B. Schierman does not show error in the penalty phase
¶468 Without question, "the experienced trial court judge correctly applied a complicated set of constitutional and evidentiary rules to a contentious and emotionally *771 charged proceeding," and the lead opinion correctly analyzes the vast majority of Schierman's penalty-phase arguments. Lead opinion at 1104. However, the trial court did not err in its rulings on the scope of expert testimony that would be allowed by Drs. Mark Cunningham and Mark McClung, and Schierman's sentence is not statutorily disproportionate.
1. Proffered testimony by Dr. Cunningham
¶469 Schierman claims that his sentence should be reversed because the trial court limited a belatedly disclosed expansion of expert testimony from Dr. Cunningham, a proposed defense witness who was ultimately never called to testify. Schierman's argument mischaracterizes the record and draws erroneous conclusions from the effect of the trial court ruling. The trial court did not err.
¶470 It must be recognized at the outset what trial court decision we are reviewing. Well before trial, Dr. Cunningham was properly disclosed as a potential mitigation witness. The disclosure indicated that his testimony would be "concordant with his interviews of [Schierman] in so far as they relate to Alcoholic Blackout /Propensity/History." Clerk's Papers (CP) at 26403. At the completion of the guilt phase, the defense filed a supplemental disclosure, again specifying Dr. Cunningham's testimony would "relate to alcoholic blackout." Id. at 26424. However, in opening statements for the penalty phase, defense counsel stated for the first time that Dr. Cunningham would "testify with respect to what type of criminal behavior is predictive of an inmate's prison behavior" and would include testimony related to future prison behavior. VRP (Apr. 19, 2010) at 86. The State objected to the expanded scope of Dr. Cunningham's proposed testimony on two grounds: violation of the court's discovery orders and relevance. The trial court denied the State's motion and allowed the proposed expansion of the testimony, subject to a relevancy determination. Schierman is thus seeking reversal based on a trial court ruling that was largely in his favor.
*772 ¶471 Worth noting is that the trial court would have been justified in excluding all of the expanded testimony based on defense counsel's "blatant and intentional" violation of the court's discovery orders. VRP (Apr. 20, 2010) at 16. Defense counsel never provided an adequate explanation for its failure to timely disclose the full intended scope of Dr. Cunningham's proposed testimony, and the court observed that the only apparent explanation for the defense's "incredibly untimely disclosure," id., was "for tactical reasons," id. at 15. However, the trial court ultimately ruled that it would allow the expanded testimony from Dr. Cunningham regarding future dangerousness, including testimony and opinion about Schierman's development as a child and adolescent, his addictions, his alcohol treatment and recovery, and his institutional adjustment in jail, to the extent they were relevant. VRP (Apr. 30, 2010) at 10.[4]
*1157 ¶472 Nevertheless, Schierman argues that the trial court erred in limiting part of Dr. Cunningham's proposed testimony by basing its decision on Morva v. Commonwealth, 278 Va. 329, 683 S.E.2d 553 (2009). This argument is simply wrong. Morva would have directed the trial court here to exclude Dr. Cunningham's expanded testimony entirely, and that is not what happened here.
¶473 In Morva, the Virginia Supreme Court upheld the trial court's exclusion of all of Dr. Cunningham's testimony, including the risk assessment specific to the defendant and the Virginia prison system. The court concluded:
It is true that, in this case, unlike Porter [v. Commonwealth, 276 Va. 203, 661 S.E.2d 415 (2008) ], Dr. Cunningham proposed to provide testimony that concerns Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors might bear on his adjustment to *773 prison. However, other testimony Dr. Cunningham proposed to give, and to rely upon in giving a prison risk assessment for Morva, such as potential security interventions that "could be brought to bear" upon Morva, and the rates of assaults in the Virginia Department of Corrections, is, by statute, not relevant to the determination the jury has to make concerning Morva's future dangerousness and therefore would not be admissible evidence.
Morva, 278 Va. at 350, 683 S.E.2d 553. Based on this holding, the argument that the trial court here applied Morva 's analysis is not supportable. While the State cited Morva in support of its motion to exclude all of Dr. Cunningham's late-disclosed testimony, the trial court denied total exclusion, allowing Dr. Cunningham's relevant testimony that specifically related to Schierman, including the prison risk assessment pertaining specifically to him.
¶474 What Schierman takes issue with is the trial court decision excluding some of Dr. Cunningham's proposed testimony relating to other inmates incarcerated in other state prisons based on relevancy. That decision was not error. Our statute focuses the relevancy inquiry under RCW 10.95.070(8), where the jury is directed to consider "[w]hether there is a likelihood that the defendant will pose a danger to others in the future." (Emphasis added.) The focus of the allowable evidence thus plainly centers on the defendant and his circumstances. Eighth and Fourteenth Amendment to the United States Constitution's jurisprudence similarly supports the trial court's decision to limit Dr. Cunningham's future dangerousness testimony.[5] Even recognizing a relaxed standard applicable in capital proceedings and allowing wide latitude for the admission of testimony, any proposed testimony or expert opinion must relate to the defendant and his or her circumstances to be relevant.
*774 ¶475 The trial court here reviewed each proposed, newly disclosed Microsoft PowerPoint slide and excluded some based on relevancy because some individual slides had nothing to do with Schierman personally and involved prison statistics from other states. Meanwhile, the trial court indicated it would allow Dr. Cunningham to testify that past violence in the community is not strongly associated with prison violence and that the severity of the crime is not a good predictor of prison adjustment.[6] CP at 8306 (contents of slide 26). The trial judge
also permitted [Dr. Cunningham] to testify that serious violence is rare in prison (slides 27-28), to the low rates of inmate assaults and homicide in the Washington [Department of Corrections] (slides 29-BO), and to the number and proportion of inmates convicted of homicide in Washington prisons (slide 31). CP 8306-07; 109RP 24-25. The court also permitted testimony *1158 as to slide 35, which states that nothing about Schierman increased his risk of serious violence in prison, and listed five specific factors that decreased his risk of serious violence. CP 8307; 109RP 25.
Br. of Resp't at 171. This was entirely appropriate because the inquiry focuses on "Mr. Schierman's likelihood of presenting future dangerous [ness] or being involved in the future dangerous acts while confined in the 1 Washington State Department of Corrections." VRP (Apr. 30, 2010) at 3 (emphasis added).
¶476 The record thus shows that the trial court properly Concluded that the relevant testimony would be limited to Schierman's ability to adjust to incarceration, consistent with RCW 10.95.070(8)'s directive that the jury can consider the "likelihood that the defendant will pose a danger to others in the future." The trial court's exclusion of some of Dr. Cunningham's proposed testimony was not erroneous.
*775 2. Proffered testimony by Dr. McClung
¶477 The trial court properly excluded Dr. McClung's testimony regarding traumatic brain injury. "Before allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading." Johnston-Forbes v. Matsunaga , 181 Wash.2d 346, 357, 333 P.3d 388 (2014). Here, the factual foundation for Dr. McClung's proffered testimony was inadequate.
¶478 Because Dr. McClung's proposed testimony was "premised upon a chain of other experts and their evaluations," the trial court correctly considered the foundation of each link in that chain. VRP (Apr. 29, 2010) at 7. The first link in the chain was a report by Dr. Wendy Cohen, which concluded that the scan was "suggestive of a prior insult which involved a compon[e]nt of hemorrhage." CP at 8252. Dr. Cohen did not opine that Schierman's brain scan indicated that he had suffered multiple traumatic head injuries, or even raise that possibility.
¶479 The next link in the chain of expert evaluations was a letter by Dr. Paul Connor, dated April 24, 2010. Dr. Connor concluded, based on Schierman's medical records, that the prior head injury Dr. Cohen found was consistent with a concussive head injury Schierman suffered while playing football in 1997. Id. at 8257. Dr. Connor then noted that "Schierman and his family have reported a number of incidents of domestic violence in which he was struck in the head by his biological father." Id. From these reports, Dr. Connor concluded that "it would appear that Mr. Schierman has experienced multiple head injuries in his life." Id. Dr. Connor did not elaborate on the extent of domestic violence, describe any particular incident, or suggest that any act of domestic violence by Schierman's father may have contributed to the hemorrhaging noted by Dr. Cohen. Nevertheless, Dr. Connor concluded "that a history of multiple head trauma [s] is a more parsimonious etiology than that of [nonverbal learning disorder]." Id. (boldface omitted).
*776 ¶480 The next day, Dr. Richard Adler provided the final link in the chain of expert opinions that formed the basis for Dr. McClung's proposed testimony. Dr. Adler opined that Schierman suffered " '[p]ost-concussion syndrome' " after his 1997 football injury. Id. at 8249 (quoting Denise Garvey, When Can Teens Return to Sports After a Head Injury ?, 4 PROCEEDINGS OF UCLA HEALTHCARE 47 (Winter 2000)). [http://perma.cc/JS9R-VN9D]. However, Dr. Adler's declaration also states that post-concussion syndrome occurs " '[a]fter a history of head trauma with LOC [loss of consciousness] and post-injury amnesia.' " Id. (second alteration in original) (quoting Garvey, supra, at 47). The trial court thus did not make an unqualified medical judgment about the necessary level of severity for prior head injuries-Dr. Adler, a licensed medical doctor, provided that information.
¶481 However, the trial court correctly concluded that there was no factual evidence that Schierman had a history of multiple head traumawith loss of consciousness and post-injury amnesia. The foundation for Dr. McClung's proposed testimony depended on such a history.
¶482 Even as applied to proffered mitigating evidence in the penalty phase of a capital case, "the trial court maintains its traditional authority 'to exclude, as *1159 irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " State v. Davis, 175 Wash.2d 287, 318, 290 P.3d 43 (2012) (quoting Lockett v. Ohio, 438 U.S. 586, 604 n.12, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ).[7] Furthermore, " 'mitigating evidence' is not defined as any evidence, regardless of its content or relevance, that would disincline the jury to impose the penalty of death. Mitigating evidence is that which 'in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.' " State v. Pirtle, 127 Wash.2d 628, 671, 904 P.2d 245 (1995) (quoting State v. Bartholomew, 101 Wash.2d 631, 647, 683 P.2d 1079 (1984) ). *777 ¶483 Dr. McClung's proposed testimony might be properly considered as extenuating or reducing the degree of moral culpability as applied to a person who did have a history of multiple head trauma with loss of consciousness and post-injury amnesia.[8] However, without any foundational evidence that Schierman had such a history, the proposed testimony was irrelevant. The trial court therefore did not err in excluding Dr. McClung's testimony due to its inadequate foundation.
3. Statutory capital sentence review
¶484 Because the trial court did not err in its evidentiary rulings, Schierman's sentence should be affirmed if it passes a statutory capital sentence review, which requires the court to address four issues:
(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4) ;[9] and
(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120 ;
(c) Whether the sentence of death was brought about through passion or prejudice; and *778 (d) Whether the defendant had an intellectual disability within the meaning of RCW 10.95.030(2).
RCW 10.95.130(2). As correctly noted by the lead opinion, the arguments in this case focus on the second and third issues, which are whether Schierman's sentence is disproportionate or was brought about through passion and prejudice. Lead opinion at 1137.
¶485 Schierman does little to highlight specific facts about himself, his crimes, or comparable cases indicating that "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). Instead, he argues, and the lead opinion agrees, that "Washington's death penalty is imposed in a wanton and freakish manner," such that every capital sentence in Washington should be found statutorily disproportionate. Appellant's Opening Br. at 198; see lead opinion at 1137-44. However, as Schierman recognizes, this court has already rejected that argument, and he provides no new information or argument that could justify revisiting our precedent.[10] Appellant's Opening Br. at 198 *1160 (citing Davis, 175 Wash.2d at 353-54, 290 P.3d 43 ).
¶486 When conducting a statutory disproportionality review, "[t]he goal is to ensure that the sentence, in a particular case, is proportional to sentences given in similar cases; is not freakish, wanton, or random; and is not based on race or other suspect classifications."[11] State v. Cross, 156 Wash.2d 580, 630, 132 P.3d 80 (2006) (emphasis added). To do this, "we must consider at least (1) the nature of the crime, (2) the aggravating circumstances, *779 (3) the defendant's criminal history, and (4) the defendant's personal history, as well as any additional substantive challenges to the proportionality of the sentence." Davis, 175 Wash.2d at 348, 290 P.3d 43.
¶487 The nature of Schierman's crimes was indisputably horrific. At a time when he knew that Olga Milkin's husband was deployed overseas, Schierman entered her home and killed her along with her two sons, who were three and five years old, and her sister, who was a college student. Olga Milkin and her sister were stripped of their clothing and stabbed repeatedly in the head and neck. Both were stabbed in the neck from the front with such force that the knife actually damaged their spines, and there was evidence that they attempted to fight back, indicating that they endured significant conscious suffering before they died. One of the children was stabbed through the throat from one side to the other, and the other child's throat was cut so deeply that he was nearly decapitated. When Schierman woke up in the Milkins' home and found himself covered in blood with four dead bodies, he took a shower, changed his clothes, and attempted to bum the house down in order to destroy the evidence. The nature of these crimes is at least as brutal as others in which we have upheld a capital sentence. See id. at 349-51, 290 P.3d 43.
¶488 The only aggravating factor submitted to the jury was that "[t]here was more than one victim and the murders were part of a common scheme or plan." RCW 10.95.020(10). However, "[t]he nature of the aggravating circumstances, as well as the number, is important to consider." Davis, 175 Wash.2d at 351, 290 P.3d 43. As applied to the particular facts presented, the nature of this aggravating circumstance goes beyond the minimal statutory requirements-Schierman's crimes ended the lives of a young mother and her two small children while their father was deployed overseas, as well as the children's aunt who was there to help while their father was gone. He literally destroyed the Milkin family and their home.
*780 ¶489 Schierman's lack of prior convictions and difficult personal history neither require nor prevent a finding of disproportionality. Id. at 353, 290 P.3d 43 ; Cross, 156 Wash.2d at 633-34, 132 P.3d 80 ; State v. Rupe, 108 Wash.2d 734, 770, 743 P.2d 210 (1987). But in light of the evidence showing Schierman planned these crimes for a time when the victims were particularly vulnerable because Mr. Milkin was deployed overseas, the ruthless nature of the murders themselves, and Schierman's subsequent efforts to destroy the evidence by burning the Milkins' house down, Schierman's sentence is not disproportionate to the penalty imposed in similar cases.
¶490 Schierman also contends that his sentence was brought about by passion and prejudice because the State's case "emphasize[d] that the victims were so 'worthy' that Schierman deserved death regardless of the constraints of the law." Appellant's Opening Br. at 203. However, he largely points to aspects of the State's case that were either entirely proper or harmless. Lead opinion at 1091-94 (circumstantial evidence of sexual motivation), 1094-97 (Mr. Milkin's military service), 1120-21, 1123-24 (the Milkins' persecution, immigration, and religious faith). Thus, "[w]e have already addressed and rejected these claims." Davis , 175 Wash.2d at 374, 290 P.3d 43.
¶491 In addition, Schierman raises the fact that the jury was shown "many, many gruesome photographs." Opening Br. of Appellant at 203. Schierman does not specify *1161 which photographs he is referring to, but both autopsy and crime scene photographs may be admitted subject to evidentiary rules. State v. Yates, 161 Wash.2d 714, 768, 168 P.3d 359 (2007) (autopsy photographs admissible so long as they are accurate and more probative than prejudicial); Cross, 156 Wash.2d at 618, 132 P.3d 80 ("Generally, photographs taken by police of a crime scene will be admissible so long as the entry was lawful."). Schierman provides no explanation of how the photographs the jury saw here made an improper appeal to passion or prejudice in this particular case. *781 ¶492 Finally, the State's references to the Holocaust were improper. See lead opinion at 1132-34. However, the court instructed the jury to disregard those statements, and when considered in the context of the entire trial and all the evidence presented, it cannot be said that they necessarily so inflamed the passions or prejudices of the jury that its sentencing verdict must be reversed.
CONCLUSION
¶493 This opinion is not intended to either endorse or criticize the wisdom or constitutionality of capital punishment generally, nor is it intended to express any views about the appropriate resolution of any challenges to capital punishment that have been raised in other cases. However, based on the record and issues presented in this case, Schierman's convictions and sentence should be affirmed.

State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995).

The Supreme Court of the United States has never rejected the possibility of a de minimis closure despite such federal appellate cases recognizing the possibility. See State v. Sublett, 176 Wash.2d 58, 116, 292 P.3d 715 (2012) (Madsen, C.J., concurring).

To reiterate, this is a different inquiry from that presented by the logic prong of the experience and logic test. It is already established that for-cause challenges implicate the public trial right generally. State v. Love, 183 Wash.2d 598, 605, 354 P.3d 841 (2015). Applying the de minimis test, meanwhile, requires us to determine whether the purposes of the public trial right were actually undermined in this particular case.

On the issue of future dangerousness, extensive witness testimony was presented regarding Schierman's conduct in jail while he was awaiting trial, including testimony from two jail witnesses, and family and friends who testified. Also, Eldon Vail, former secretary of the Department of Corrections, testified extensively for the defense specific to the prison security Schierman would face if incarcerated.

"[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (second emphasis added).

The defense chose not to call Dr. Cunningham to testify, so we have no record of what actual testimony he would have presented. We need not reach the State's argument that Schierman waived any objection to the trial court's limitation of Dr. Cunningham's testimony because Schierman's objections are without merit.

The limits on this traditional authority are the same under both the state and federal constitutions. Davis, 175 Wash.2d at 318 n.12, 290 P.3d 43.

It only " might " be properly considered because Dr. McClung was also unable to reach any conclusion about whether any prior head injuries Schierman may have suffered actually had any impact on his behavior or mental processes. See CP at 8259-60.

RCW 10.95.060(4) provides, "Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' "

This court has shown it is firmly committed to carefully considering new information regarding the constitutionality of capital punishment. See Order, State v. Gregory, No. 88086-7 (Wash. Nov. 21, 2017). That issue is simply not presented here. Schierman does not provide any new information or any new arguments, and the relevant portions of his briefing do not engage in any meaningful analysis of any constitutional provisions. See Appellant's Opening Br. at 197-202; Appellant's Reply Br. at 72-75.

Schierman is white, and there is no indication that race or any other suspect classification was implicated at any point in these proceedings.