

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **NOV 0 8 2018**

~~Fairhurst~~
**CHIEF JUSTICE**

This opinion was filed for record

at **8:00 am** on **Nov 8, 2018**

**SUSAN L. CARLSON**
**SUPREME COURT CLERK**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 88906-6 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| BYRON EUGENE SCHERF, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | Filed **NOV 0 8 2018** |

JOHNSON, J.—While in prison serving a life without parole sentence, Byron Scherf murdered a prison guard. He was tried, convicted of aggravated murder, and sentenced to death. In his appeal, he raises multiple claims of error: procedural, statutory, and constitutional. Based on the holding of *State v. Gregory*, No. 88086-7 (Wash. Oct. 11, 2018),[1] we vacate the sentence. For the following reasons, we affirm the conviction.

---

[1] http://www.courts.wa.gov/opinions/pdf/880867.pdf.

Scherf raises issues specific to the guilt phase that must be addressed.

*Did the trial court err in denying Scherf's motion to suppress physical evidence pursuant to Superior Court Criminal Rule (CrR) 3.6?*

Scherf alleges that the trial court erred in denying his motion to suppress physical evidence for three reasons, each of which we discuss in turn.

Privacy Right to Medical Records

First, Scherf argues that medical records seized from his cell at the Washington State Reformatory (WSR) should have been suppressed because he had a statutory right to privacy in the medical records found in his cell under the Uniform Health Care Information Act (Act), chapter 70.02 RCW. He argues that the medical records in his cell, which were viewed by Washington State Department of Corrections (DOC) officials during a search authorized by a warrant, were outside the scope of the warrant and then improperly used to establish probable cause for warrant 11-32, a subsequent warrant. He argues the portions of the affidavit supporting warrant 11-32 describing these medical records should not have been included because they were fruits of the illegal search. Scherf concedes that he has no Fourth Amendment privacy rights but asserts he had a statutory right to privacy under the Act.[2]

---

[2] Under the Fourth Amendment to the United States Constitution, a prisoner has no reasonable expectation of privacy in documents found in his prison cell or taken from his cell and stored. *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *United*

The Act regulates disclosure and access to medical and health care information. The legislature found that "[h]ealth care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests." RCW 70.02.005(1). Therefore, the Act provides limitations as to when health care information may be disclosed without the consent of the patient:

> Except as authorized elsewhere in this chapter, a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization. A disclosure made under a patient's written authorization must conform to the authorization

RCW 70.02.020(1). The Act does not limit disclosure by the patient of his own health care information.

A "health care provider" is defined as "a person who is licensed, certified, registered, or otherwise authorized by the law of this state to provide health care in the ordinary course of business or practice of a profession." RCW 70.02.010(19). However, the legislature has also noted that

> [p]ersons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care

---

States v. Edwards, 415 U.S. 800, 808, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974); *State v. Cheatam*, 112 Wn. App. 778, 786, 51 P.3d 138 (2002), *aff'd*, 150 Wn.2d 626, 81 P.3d 830 (2003).

information survives even when the information is held by persons other than health care providers.

RCW 70.02.005(4).

Scherf argues that the medical records were effectively held by DOC because they were in Scherf's cell and, therefore, DOC had a duty to protect his privacy interest under RCW 70.02.005. The State argues that the Act does not limit disclosure by the patient of his personal medical or mental health records, so the protections of the Act do not apply to records Scherf chose to keep in his cell. Last, the State notes that Scherf kept the items in his cell and the records were not kept confidential because Scherf's cell was subject to periodic searches by the corrections staff under DOC Policy 420.320 (rev. Sept. 1, 2015).

Here, the medical records at issue were not held by a health care provider or facility. Importantly, RCW 70.02.005(4) does not carve out a duty to non-health-care providers but merely states it is "the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers." Plus, the information was held in the cell. The statute cannot be read to require DOC to obtain authorization from an inmate, especially in light of Fourth Amendment case law that clearly establishes that there is no expectation of privacy in items in an inmate's cell or taken from his or her cell. The information stored in

Scherf's cell was not improperly used to establish probable cause for the issuance of warrant 11-32 because the records were not protected from disclosure by statute and Scherf had no expectation of privacy in his cell.

Probable Cause

Second, Scherf argues that the medical records seized should have been excluded from the affidavit in support of warrant 11-32 and, therefore, the affidavit was insufficient to provide probable cause.

The Fourth Amendment provides that warrants may be issued only upon a showing of "'probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *State v. Maddox,* 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). Probable cause exists where there are facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity and that evidence of the crime can be found at the place to be searched. *State v. Thein,* 138 Wn.2d 133, 140, 977 P.2d 582 (1999). In addition, probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched. A magistrate is entitled to make reasonable inferences from the facts and circumstances set forth in the affidavit.

We review the issuing magistrate's determination of probable cause for abuse of discretion and give probable cause determinations great deference. *State v. Clark*, 143 Wn.2d 731, 748, 24 P.3d 1006 (2001). All doubts are resolved in favor of upholding the warrant. *State v. Kalakosky*, 121 Wn.2d 525, 531, 852 P.2d 1064 (1993).

The trial court held that search warrant 11-32 was supported by probable cause because "evidence of a crime" is broadly defined. Clerk's Papers (CP) at 2290. The trial court noted that "of" meant "'proceeding from; belonging to; relating to; connected with; [or] concerning.'" CP at 2290 (alteration in original) (quoting *State v. Rinkes*, 49 Wn.2d 664, 666, 306 P.2d 205 (1957)). The phrase "evidence of a crime" is recognized as broader than evidence proving a crime was committed. It also includes evidence relating to, connected with, or concerning a crime. Given this broad definition, the trial court concluded, "Evidence relating to the sentence the court is empowered to impose[, such as mitigation evidence,] is evidence of a crime," especially where the State is statutorily obliged to consider mitigation evidence when deciding what sentence to seek. CP at 2290; *see* RCW 10.95.040(1). Furthermore, the mental capacity of a defendant is a statutory consideration for a jury in a capital case. Thus, the trial court reasoned that any

medical records indicating mental health issues are potentially relevant in a case with the potential of capital punishment.

Scherf argues that "evidence of a crime" does not include mitigation evidence. He argues that nothing linked the records to the death of Officer Jayme Biendl or his involvement in it and that all of those records predated the crime. Scherf also takes issue with Detective B. Scott Wells's speculation that the records could be used to defeat defenses Scherf might assert in this case.

The State argues, and the trial court held, that "evidence of a crime" includes evidence relating to sentencing factors. Br. of Resp't at 33. The State and the trial court noted that *Blakely v. Washington*[3] requires every fact that enhances punishment be pleaded and proved to a jury. The State argues that any fact that bears on the decision the jury must make is all part "of the crime" under investigation. The State argues that it was reasonable to believe that the prison would have a medical file for Scherf that included medical and psychological evidence bearing on his mental and physical condition. In addition, the State argues that it was reasonable to believe that those files would have evidence that bore on Scherf's ability to form premeditated intent to kill.

---

[3] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

We agree with the trial court. Here, probable cause exists based on the facts and circumstances and was sufficient to establish a reasonable inference that evidence of the crime, in the form of mitigation evidence, could be found at the place to be searched.

The police were investigating the crime of aggravated first degree murder when they sought warrant 11-32. The affidavit supporting warrant 11-32 attached and incorporated by reference the affidavit for warrant 11-28. The affidavit supporting warrant 11-28 stated that on January 29, 2011, Scherf was missing from the scheduled inmate count. About 10 minutes later, corrections officers found him in the prison chapel with blood on his hands and clothes. About 1 hour later, Officer Biendl was found deceased in the chapel.

The State sought a search warrant to obtain mitigation evidence that would allow it to consider the death penalty, and the search warrant detailed sufficient facts and circumstances to establish a reasonable inference that mitigation evidence could be found at the place searched. The affidavit supporting warrant 11-32 detailed facts related to Scherf's mental and physical abilities. It noted that Scherf maintained numerous documents and books in his cell, including medical and psychological reports. The documents detailed Scherf's history in the military, prison, and school. The reports and documents revealed that Scherf was capable of

forming the premeditated intent to commit the murder by demonstrating the lack of any mental disease or defect. The officers also reasonably believed that medical records would contain evidence regarding the types and frequency of medications Scherf took and that evidence of skipping the "pill line" that night would suggest that he was in the chapel at the time of the murder.

The affidavit set out numerous facts that establish a nexus between the crime and Scherf. The facts outlined in the affidavit support the inference that the files could contain evidence relating to the elements of the crime, aggravating factors, and potential mitigation. There was sufficient support to establish probable cause to search those files.

In addition, Scherf argues that the trial court's ruling conflicts with the Superior Court Special Proceedings Rules—Criminal (SPRC) for capital cases. He argues that SPRC 5[4] preserves a defendant's privacy interest in reports concerning his mental condition. Scherf's argument is unpersuasive. SPRC 5 regulates

---

[4] SPRC 5(g) provides that "[w]ithin 24 hours after a jury returns a verdict finding a defendant guilty of aggravated murder in the first degree, the court will require the defendant to elect whether he or she may present expert testimony at the special sentencing proceeding concerning his or her mental condition. If the defendant elects not to present such testimony, the report shall remain permanently sealed, the restrictions set out in subsection (f) shall remain permanently in effect, and the State shall be permanently prohibited from direct or derivative use against the defendant of the report or of materials or information provided to the expert. If the defendant elects to present such testimony, the court shall provide a copy of the experts' reports to the prosecuting attorney and shall relieve the experts of the restrictions. The prosecuting attorney may use information obtained from the expert solely to rebut expert testimony offered by the defense at the special sentencing proceeding."

disclosure of defense or prosecution expert witness reports created for the purposes of a special sentencing. It does not limit the investigation into or use of medical or psychological reports created as a result of evaluation or treatment for some other purpose.

Particularity Requirement

Third, Scherf argues that warrant 11-32 failed to meet the particularity requirement of the Fourth Amendment. We review whether a warrant meets the particularity requirement de novo. *State v. Perrone*, 119 Wn.2d 538, 549, 834 P.2d 611 (1992). A valid warrant under the Fourth Amendment must particularly "'describ[e] the place to be searched, and the persons or things to be seized.'" *Maddox*, 152 Wn.2d at 505. The particularity requirement prevents general searches, seizure of objects on the mistaken assumption that they fall within the issuing magistrate's authorization, and the issuance of warrants on loose, vague, or doubtful bases of fact.

Warrants "'must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" *Perrone*, 119 Wn.2d at 546 (quoting *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981)). By describing the items to be seized with particularity, the warrant limits the discretion of the executing officer to determine what to seize. A description is valid if it is as specific as the

circumstances and the nature of the activity, or crime, under investigation permits.

A warrant that lists generic classifications is not impermissibly broad "if probable

cause is shown and a more specific description is impossible." *State v. Stenson,*

132 Wn.2d 668, 692, 940 P.2d 1239 (1997).

Warrant 11-32 authorized the search and seizure of "WSR inmate property

and storage room" and "WSR Administration Building," as well as

> [a]ny and all records, documents, papers, writings both typed and
> handwritten, books or any other personal records for inmate Byron E.
> Scherf 08-13-1958, DOC #287281. Such records and papers are to
> include; Schooling and educational documentation and records,
> certificates of educational achievement, military records,
> psychological evaluations and assessments, psychological records,
> medical records to include medication information, prison records to
> include work history, housing history, and disciplinary issues, books,
> books with specific selections highlighted, underlined or bookmarked
> and writings in the margins of such books.

CP at 2351-52 (boldface omitted). In addition, the accompanying affidavit for

search warrant that was both physically attached and incorporated by reference

specifically identified "WSR records retention" as an area to be searched. CP at

2353 (boldface omitted).

First, Scherf argues that the warrant's description of the place to be searched

as "WSR records retention" is impermissibly broad because records could be

contained in many places throughout the prison; the warrant did not specifically

list the medical records room. The trial court noted that the medical records room

11

is located on the WSR premises and the warrant allowed Detective Wells to seek and obtain Scherf's medical records "wherever retained within the Washington State Reformatory." CP at 2293. The warrant described the location to be searched generally as the "Washington State Reformatory (WSR) located at 16550 177th Avenue S.E. Monroe, Washington." CP at 2351 (boldface omitted). The medical records room was located on the WSR premises; therefore, it was encompassed within the scope of the warrant. We agree with the trial court; read together, the warrant and the affidavit specified that the WSR would be searched.

Second, Scherf argues that the warrant failed to describe the items to be seized and the place to be searched with particularity because it was broadly phrased with no limitations or guidelines. He relies on *United States v. Spilotro,* 800 F.2d 959 (9th Cir. 1986), and *State v. Riley*, 121 Wn.2d 22, 846 P.2d 1365 (1993), to argue similar generalizations have been held to be impermissibly broad. In *Spilotro*, 800 F.2d at 962, the Ninth Circuit held that a warrant in a suspected organized crime case was overbroad when it authorized seizure of "'notebooks, notes, documents, address books, and other records[, etc.].'" In *Riley*, 121 Wn.2d at 26, we held that a warrant in a computer trespass and possession of a stolen access device case was overbroad when it authorized the seizure of "'notes, records, lists, ledgers, information stored on hard or floppy discs, personal

12

computers, modems, monitors, speed dialers, touchtone telephones, electronic calculator, electronic notebooks or any electronic recording device.'"

The State points to *Stenson* as an example of a similar warrant held to be sufficiently particular. The court in *Stenson* held that a warrant that limited the search and seizure of business, financial, and personal records that indicated a relationship between the defendant and the victims was not impermissibly broad. As Scherf points out, the scope of the warrant in *Stenson* was limited by the requirement that such records must be related to the parties' relationship. In that case, we found that there was probable cause to believe a crime had been committed and that evidence of the relationships between the two couples (the defendant, defendant's wife, victim, and victim's wife) related to the crime. Here, there was no such limitation, and Scherf argues warrant 11-32 authorized the search and seizure of virtually any and every paper having anything to do with him.

Scherf minimizes the crucial distinction that *Spilotro* and *Riley* were not capital cases. Here, the trial court held the particularity requirement was met because the records sought were potentially relevant to mitigation, and the court was correct in acknowledging "[t]he evidence which may be considered in a capital case is unique and cannot be compared to the more limited evidentiary

requirements of other non-capital cases." CP at 2292. Capital cases require the prosecutor to weigh mitigation evidence prior to filing the death notice. RCW 10.95.040(1). In light of this requirement, a warrant authorizing a search for "records, documents, papers, writings both typed and handwritten, books or any other personal records for inmate Byron E. Scherf 08-13-1958, DOC #287281" relates to potential evidence specifically relevant in a capital case. CP at 2351 (boldface omitted). The warrant further specified that those records referred to education, military, psychological, medical, and prison records.

If "the precise identity of items sought cannot be determined when the warrant is issued, a generic or general description of items will be sufficient if probable cause is shown and a more specific description is impossible." *Stenson*, 132 Wn.2d at 692 (citing *Perrone*, 119 Wn.2d at 547). Because we have held that the affidavit accompanying warrant 11-32 was sufficient to establish probable cause and given the broad nature of mitigation evidence, we hold the description of items to be seized in warrant 11-32 complied with the particularity requirement. The trial court did not err in denying Scherf's motion to suppress evidence.

*Did the trial court err when it denied Scherf's motion to suppress his videotaped statements made to the police on February 7, 9, 10, 11, and 14, 2011?*

Scherf argues that the trial court erred in denying his motion to suppress videotaped statements for four reasons: (1) he was denied access to counsel under CrR 3.1; (2) he was held unlawfully in the Snohomish County Jail in violation of RCW 72.68.040 and .050; (3) he was denied due process by the prosecutor's failure to bring him promptly before the court as required by CrR 3.2.1(d)(1) and CrRLJ 3.2.1(d)(1); and (4) his statements were involuntary under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The trial court denied the motion to suppress on all grounds and entered written findings of fact and conclusions of law.

We review findings of fact related to a motion to suppress under the substantial evidence standard. "Substantial evidence is 'evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). "'Unchallenged findings of fact entered following a suppression hearing are verities on appeal.'" *State v. Eisfeldt*, 163 Wn.2d 628, 634, 185 P.3d 580 (2008) (quoting *State v. Gaines*, 154 Wn.2d 711, 716, 116 P.3d 993 (2005)). We review the trial court's conclusions of law de novo.

Even if evidence is obtained in violation of constitutional rights, the error may be harmless. "[C]onstitutional error may be considered harmless if we are convinced beyond a reasonable doubt that any reasonable trier of fact would have reached the same result despite the error." *State v. Thompson,* 151 Wn.2d 793, 808, 92 P.3d 228 (2004) (citing *State v. Brown,* 140 Wn.2d 456, 468-69, 998 P.2d 321 (2000)). To make this determination, the court utilizes the "overwhelming untainted evidence" test. Under this test, the court considers the untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt.

Criminal Rule 3.1

Scherf was charged with aggravated first degree murder in Snohomish County Everett Division District Court on February 24, 2011. Before February 24, Scherf had not been charged; therefore, his Sixth Amendment right to counsel had not attached. While Scherf references the Sixth Amendment, he relies on CrR 3.1 to argue that his videotaped confessions should be suppressed.

CrR 3.1(b)(1) states that "[t]he right to a lawyer shall accrue as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest." Furthermore, "[a]t the earliest opportunity a person in custody who desires a lawyer shall be provided

access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer." CrR 3.1(c)(2). This court has never specified what duties police officers have under CrR 3.1. The trial court held that Scherf was taken into custody for purposes of *Miranda*[5] the moment he was placed in handcuffs on January 29, 2011. It also held that CrR 3.1 was not violated because the detectives had no obligation to delay serving a warrant in order to obtain an attorney for Scherf. The trial court noted that even if CrR 3.1 were violated, Scherf did not make statements to police prior to validly waiving his right to an attorney and therefore there was nothing to suppress. We conclude that Scherf's rights under CrR 3.1 were not violated and that even if a violation occurred, it was harmless.

The record discloses that Scherf requested an attorney on January 29, 2011, around 9:00 p.m. He argues that CrR 3.1 was violated because he was not placed in contact with an attorney immediately and that the State made no efforts to provide him with an attorney. He was not provided with immediate access to a telephone book with numbers of private attorneys and the public defender. Scherf was provided with an attorney at 9:00 a.m. the following morning. Scherf argues that

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

17

had he been provided with an attorney immediately, he would not have made any statements to law enforcement.

Determining whether officers have made reasonable efforts to contact an attorney depends on the circumstances of the case. Court of Appeals, Division Two has noted that the purpose of CrR 3.1 is to provide defendants with a meaningful opportunity to contact counsel. *State v. Kirkpatrick*, 89 Wn. App. 407, 948 P.2d 882 (1997). "Although the rule does not require the officers to actually connect the accused with an attorney, it does require reasonable efforts to do so." *Kirkpatrick*, 89 Wn. App. at 414 (emphasis omitted); *see State v. Pierce*, 169 Wn. App. 533, 548, 280 P.3d 1158 (2012). In *Kirkpatrick*, a Lewis County detective and a Lewis County deputy investigating a murder of a convenience store employee had arrested the defendant. Having been advised of his *Miranda* rights by the detective, Kirkpatrick gave a statement and asked if he could leave. The detective told him he could not leave and Kirkpatrick demanded a lawyer. The detective stopped the questioning but made no effort to contact a lawyer. The detective then drove Kirkpatrick four hours to another county where the defendant initiated three conversations with the detective. The detective reminded Kirkpatrick that he had asked for an attorney and that he could not talk to him. Kirkpatrick said that he did

not want an attorney and wanted to talk about the case. He then described the scene and admitted shooting the victim. Later, Kirkpatrick gave a taped confession.

The *Kirkpatrick* court held that the officers violated CrR 3.1 when they made no effort to contact an attorney when the defendant first requested one. The court cited *City of Bellevue v. Ohlson*[6] and *City of Seattle v. Wakenight*[7] as examples of reasonable efforts. In *Ohlson,* the officer made six attempts to telephone the arrestee's attorney. In *Wakenight,* the officer telephoned a public defender and gave the arrestee a phone book and access to a phone. The court noted that Kirkpatrick's request came several hours before confessing and that his request came during normal working hours where "presumably procedures exist for contacting defense counsel." *Kirkpatrick,* 89 Wn. App. at 415.

Similarly in *Pierce,* Division Two held that officers did not take reasonable efforts to put defendant in contact with an attorney. In *Pierce,* the trial court held that posting the public defender's business number next to the telephone and allowing free access to use the phone was sufficient to satisfy CrR 3.1(c)(2). Division Two reversed and held that merely giving an inmate access to a phone without providing the means to contact an attorney does not satisfy CrR 3.1(c)(2).

---

[6] 60 Wn. App. 485, 487, 803 P.2d 1346 (1991).

[7] 24 Wn. App. 48, 49-50, 599 P.2d 5 (1979).

The court noted that the jail's own policy of dialing public defender home numbers after hours showed the futility of simply posting the public defender's business number after hours.

The State argues that here the delay was justified because (1) detectives needed to obtain a search warrant, (2) there was a risk to prison security and the lockdown of other inmates, (3) there was concern for the safety of Scherf, and (4) restrictions were placed on the facility due to the lockdown. The State cites *State v. Mullins*[8] and *State v. Wade*[9] for support. In *Mullins,* Division One held that although CrR 3.1 states that a person in custody must be given the opportunity to call a lawyer "at the earliest opportunity," police are not required to "postpone routine prebooking procedures or the execution of a search warrant when an arrestee expresses the desire to consult an attorney." *Mullins*, 158 Wn. App. at 369-70. In *Mullins,* the defendant was arrested for murder. He was taken into custody and was completing prebooking procedures at the jail when he voluntarily made incriminating statements to the police. The detectives interrupted the defendant and reminded him that he had previously invoked his right to an attorney. The defendant said that he understood his rights but that he had something he wanted to

---

[8] 158 Wn. App. 360, 241 P.3d 456 (2010).

[9] 44 Wn. App. 154, 721 P.2d 977 (1986), *abrogated by In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 272 P.3d 209 (2012).

get "'off his chest.'" *Mullins*, 158 Wn. App. at 364. The detectives completed the prebooking form and turned the defendant over to the jail officers, who booked him. The procedure took about one and three quarters hours from the time the defendant arrived at the jail. At no time did the detectives attempt to place the defendant in contact with a lawyer. The court relied heavily on *Wade*, which held that the defendant "waived his right to counsel before the police had an opportunity to provide him with access to the phone and a list of attorneys who could possibly defend him." *Wade*, 44 Wn. App. at 159.

The State argues that this case is similar to *Mullins* and *Wade*: the detectives here did not have an opportunity to provide Scherf with an attorney due to the four issues listed above and Scherf was provided an attorney at the earliest opportunity.

The State's argument is persuasive. Scherf's rights under the rule were not violated because a combination of the detectives' investigative duties and DOC security measures and policies precluded an earlier meeting with an attorney. The trial court's findings of fact demonstrate that Scherf requested an attorney but Detective Spencer Robinson was in the process of obtaining a search warrant for collecting evidence. In addition, there was no way to contact a public defender after hours. As soon as Detective Robinson returned at 9:00 a.m. the next morning, he arranged to have a public defender meet Scherf.

Even if we were to assume arguendo that there was a violation of CrR 3.1, the claimed violation of CrR 3.1 at issue is harmless. A violation of a court rule is harmless if there is no reasonable probability that the error materially affected the outcome of the trial. *State v. Templeton*, 148 Wn.2d 193, 220, 59 P.3d 632 (2002).

Here, the trial court correctly concluded that Scherf did not provide any videotaped statements prior to meeting with an attorney. Prior to the videotaped statements Scherf met with two attorneys who both advised him to not speak to the police. He ignored the advice of counsel and voluntarily gave videotaped confessions. No violation of CrR 3.1 occurred.

Unlawful Detention at Snohomish County Jail

Scherf further argues that the trial court erred when it denied his motion to suppress his statements because he was unlawfully detained at the Snohomish County Jail, claiming RCW 72.68.040 and .050 were violated. RCW 72.68.040 permits the secretary of DOC to contract with counties for detention of prisoners sentenced to DOC in county jails:

> The secretary may contract with the authorities of the federal government, or the authorities of any state of the United States, private companies in other states, or any county or city in this state providing for the detention in an institution or jail operated by such entity, for prisoners convicted of a felony in the courts of this state and sentenced to a term of imprisonment therefor in a state correctional institution for convicted felons under the jurisdiction of the department. After the making of a contract under this section,

22

prisoners sentenced to a term of imprisonment in a state correctional institution for convicted felons may be conveyed by the superintendent or his or her assistants to the institution or jail named in the contract. The prisoners shall be delivered to the authorities of the institution or jail, there to be confined until their sentences have expired or they are otherwise discharged by law, paroled, or until they are returned to a state correctional institution for convicted felons for further confinement.

When such a contract is made, notice of the contract is required by RCW 72.68.050 to be recorded by the clerk of the court from which the sentence originated:

Whenever a prisoner who is serving a sentence imposed by a court of this state is transferred from a state correctional institution for convicted felons under RCW 72.68.040 through 72.68.070, the superintendent shall send to the clerk of the court pursuant to whose order or judgment the prisoner was committed to a state correctional institution for convicted felons a notice of transfer, disclosing the name of the prisoner transferred and giving the name and location of the institution to which the prisoner was transferred. The superintendent shall keep a copy of all notices of transfer on file as a public record open to inspection; and the clerk of the court shall file with the judgment roll in the appropriate case a copy of each notice of transfer which he or she receives from the superintendent.

Scherf argues that the requirements set forth in RCW 72.68.040 and .050 were not met because there was no contract between DOC and Snohomish County Jail and that there was no notification of the transfer on any public record kept by the superintendent or the Spokane County Superior Court, as required by RCW

23

72.68.050. Scherf argues that because his detention was unlawful, the statements obtained while he was unlawfully detained should be suppressed.

This is unpersuasive. The trial court found that it was disputed whether there was an agreement between DOC and Snohomish County to house DOC prisoners at the jail. However, the existence of an oral agreement is supported by an affidavit from Deputy Superintendent Scott Frakes. A public record of the transfer was available. Importantly, even if the statutes were violated, Scherf provides no support as to why his statements should be suppressed as a result. No statutory remedy exists for a violation of those provisions, and no basis exists otherwise.

### Criminal Rule 3.2.1

Scherf next argues that his statements should be suppressed because he was not brought before a judge "as soon as practicable" as required under CrR 3.2.1(d)(1). Scherf argues that we should adopt the *McNabb/Mallory*[10] rule and overrule *State v. Hoffman*, 64 Wn.2d 445, 392 P.2d 237 (1964).

In *Corley v. United States*,[11] the United States Supreme Court established a two-part test for applying the *McNabb/Mallory* rule. First, "a district court with a suppression claim must find whether the defendant confessed within six hours of

---

[10] *McNabb v. United States,* 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 (1943); *Mallory v. United States,* 354 U.S. 449, 77 S. Ct. 1356, 1 L. Ed. 2d 1479 (1957).

[11] 556 U.S. 303, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009).

arrest (unless a longer delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]')." *Corley*, 556 U.S. at 322 (alteration in original). If made voluntarily, "the confession [made] within that period, . . . is admissible." *Corley*, 556 U.S. at 322. If, however, "the confession occurred before presentment and beyond six hours, . . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed." *Corley*, 556 U.S. at 322. This is true even if the confession was made voluntarily.

In *Hoffman*, this court declined to adopt the *McNabb* rule and instead relied on a "voluntariness" test in determining admissibility of confessions. *Hoffman*, 64 Wn.2d at 450. If an unnecessary delay in the preliminary appearance occurs, statements given by the accused are not automatically excluded. Rather, the court considers delay as one factor to consider when determining whether a confession is involuntary.

Scherf argues that CrR 3.2.1 is a "prompt presentment" rule that should follow the *McNabb/Mallory* analysis. He argues that the *McNabb/Mallory* rule applies here because CrR 3.2.1 serves the same primary objectives as the federal rule: (1) judicial determination of probable cause and judicial review of conditions

of release and (2) to prevent unlawful detention and to eliminate the opportunity and incentive for application of improper police pressure.[12]

CrR 3.2.1(d)(1) requires, in relevant part, that "any defendant whether detained in jail or subjected to court-authorized conditions of release shall be brought before the superior court as soon as practicable after the detention is commenced."

First we must decide whether the *McNabb/Mallory* rule should apply to CrR 3.2.1. Second, we must determine when Scherf was detained. If Scherf was, in fact, detained, we must then determine whether he was brought before the court as soon as practicable following his detention.

We decline to overrule *Hoffman*. This court continues to employ the *Hoffman* "voluntariness" test in determining admissibility of confessions. We will not overrule a prior decision unless there has been a clear showing that the rule it announced is both incorrect and harmful. *State v. Barber,* 170 Wn.2d 854, 863-64, 248 P.3d 494 (2011). A decision is incorrect if it is based on an inconsistency with

---

[12]*See Culombe v. Connecticut*, 367 U.S. 568, 584-85, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961) ("Recognizing the need to protect criminal suspects from all of the dangers which are to be feared when the process of police interrogation is entirely unleashed, legislatures have enacted several kinds of laws designed to curb the worst excesses of the investigative activity of the police. The most widespread of these are the ubiquitous statutes requiring the prompt taking of persons arrested before a judicial officer; these are responsive both to the fear of administrative detention without probable cause and to the known risk of opportunity for third-degree practices which is allowed by delayed judicial examination." (footnote omitted)).

the court's precedent, with the State's constitution or statutes, or with public policy considerations. A decision is harmful if it has a detrimental impact on the public interest.

Scherf points out that in *Hoffman* we noted that "future developments, or a conviction that law enforcement agencies of the state are persistently indulging in undue and extensive delays between arrest and arraignment, may dictate a reconsideration of our position." *Hoffman*, 64 Wn.2d at 450. However, the record here does not indicate that there was persistent improper police pressure across the state or that there was improper police pressure in this case. The detectives repeatedly informed Scherf of his *Miranda* rights and never secretly interrogated him. No basis has been established to overrule *Hoffman*.

We must next determine when Scherf was detained. Here, the trial court held that Scherf was in custody for purposes of *Miranda* when he was handcuffed in the prison chapel and brought to the shift lieutenant's office on January 29, 2011. Scherf was moved to the Snohomish County Jail on February 1, 2011. He was booked for the murder of Officer Biendl on February 23, 2011. He appeared before Everett Division District Court Judge Roger Fisher the next day, February 24, 2011. He was held in the Snohomish County Jail for 22 days before being brought before the court. The trial court concluded that Scherf was not "detained" when he

27

was moved to the Snohomish County Jail for purposes of CrR 3.2.1 because his transfer from DOC to the Snohomish County Jail was "for his own protection, to serve his DOC sentence in the jail, a place that was also more convenient to his attorney, and more conducive to his safety, rather than being detained as a result of the new crime." CP at 1248.

Scherf argues that he was detained when he was handcuffed in the prison chapel and brought to the shift lieutenant's office and that at that time, he was being investigated for the crime of attempted escape. This argument is unpersuasive. The issue is whether Scherf was brought before a judge "as soon as practicable" for the crime of murder, not attempted escape. While he may have been in custody for purposes of *Miranda,* he was not detained for purposes of CrR 3.2.1 for the crime of murder.

Next, Scherf argues that if he was not detained in the chapel, then he was detained in the Snohomish County Jail for 22 days before he was brought before a court and asserts that he was detained because he was being held as the result of a new crime, not moved for his own protection. He argues that he was repeatedly interrogated, subject to invasive search warrants, photographed, and contacted by law enforcement for the sole purpose of investigating a new crime.

The trial court found that Scherf was transferred for his own protection and that this finding of fact is supported by substantial evidence. An affidavit from then-superintendent Scott Frakes states that Scherf was moved for his own safety. Scherf was not arrested on the murder charge until February 23. Furthermore, the State argues that a violation of CrR 3.2.1 does not support suppression of statements.

We agree with the trial court's finding that Scherf was not detained until he was booked for the murder of Officer Biendl on February 23, 2011. This case is unusual because Scherf was already in prison serving a life sentence for another crime. It is important to note that the two objectives noted by Scherf—(1) judicial determination of probable cause and judicial review of conditions of release and (2) preventing unlawful detention and eliminating the opportunity and incentive for application of improper police pressure—do not support his argument here. Scherf was already in custody serving a life without parole sentence pursuant to a prior conviction; therefore, the judge would not be making a determination of probable cause or reviewing conditions of release. Furthermore, the record does not demonstrate that there was improper police pressure. Rather it shows that detectives continued to remind Scherf of his right to an attorney and of his

*Miranda* rights. Additionally, substantial evidence supports the trial court's finding that Scherf was moved to the Snohomish County Jail for his own safety.

Even if Scherf was detained when he was moved to the Snohomish County Jail, the unreasonable delay would be a factor only in assessing whether his videotaped statements were voluntary, as discussed *infra*.

Voluntariness

Finally, Scherf argues that his videotaped statements should have been suppressed because they were not given voluntarily. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Washington State Constitution states that "[n]o person shall be compelled in any criminal case to give evidence against himself." The protection provided by the state provision in this case is coextensive with that provided by the Fifth Amendment.

> "[T]he determination whether statements obtained during
> custodial interrogation are admissible against the accused is to
> be made upon an inquiry into the totality of the circumstances
> surrounding the interrogation, to ascertain whether the accused
> in fact knowingly and voluntarily decided to forgo his rights to
> remain silent and to have the assistance of counsel."

*State v. Unga,* 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (alteration in original) (quoting *Fare v. Michael C.,* 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d

197 (1979)). Because the Fifth Amendment protects a person from being compelled to testify against himself or herself, the question whether admission of a confession constituted a violation of the Fifth Amendment does not depend solely on whether the confession was voluntary. Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Thus, both the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important. *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). A promise made by law enforcement does not render a confession involuntary per se but is instead one factor to be considered in deciding whether a confession was voluntary. *Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *State v. Broadaway*, 133 Wn.2d 118, 132, 942 P.2d 363 (1997).

Other circumstances that are potentially relevant in the totality of the circumstances analysis include the "crucial element of police coercion"; the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct.

31

1745, 123 L. Ed. 2d 407 (1993); *State v. Rupe,* 101 Wn.2d 664, 679, 683 P.2d 571 (1984) (plurality opinion).

Here, the trial court ruled that Scherf was in custody for purposes of *Miranda* once he was placed in restraints in the chapel and escorted to the shift lieutenant's office. The record supports this conclusion. Because Scherf was in custody, his statements are admissible if, under the totality of the circumstances surrounding the interrogation, he knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. *Unga,* 165 Wn.2d at 100.

Scherf argues that his videotaped statements were involuntary due to (A) his conditions of confinement, (B) the unreasonable delay under CrR 3.2.1, (C) the State's interference with his right to counsel, and (D) his improper confinement at the Snohomish County Jail.

A. Conditions of Confinement

Scherf argues that his conditions of confinement at WSR rendered his videotaped statements involuntary and that his conditions of confinement were unconstitutional. He notes that he was not provided food, water, medicine, or blankets. *See Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982) (adequate food is a basic human need protected by the Eighth Amendment to the United States

Constitution), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995); *Keenan v. Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996) ("While prison food need not be 'tasty or aesthetically pleasing,' it must be 'adequate to maintain health.'" (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993))). He argues he was denied his hygiene products, glasses, and a Bible. *See Keenan*, 83 F.3d at 1091 ("[I]nmates have the right to personal hygiene supplies such as toothbrushes and soap."). He was unable to call his mother and wife. *See Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir. 1986) (prisoners have a right under the First Amendment to the United States Constitution to telephone access subject to reasonable security limitations). The lights were on 24 hours a day. *See Grenning v. Miller-Stout,* 739 F.3d 1235, 1238-39 (9th Cir. 2014) ("'[T]here is no legitimate penological justification for requiring inmates to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional.'" (quoting *Keenan,* 83 F.3d at 1090)). He argues he was forced to relieve himself through a grated hole in the ground. *See Keenan,* 83 F.3d at 1090 ("Inadequate 'ventilation and air flow' violates the Eighth Amendment if it 'undermines the health of inmates and the sanitation of the penitentiary.'" (quoting *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir. 1985))). Scherf argues that these conditions did not change until he agreed

to confess in exchange for modest improvements. During the pretrial hearing, Dr. Stuart Grassian, the defense psychiatrist, explained that harsh conditions and the isolation of solitary confinement make people ill. He opined that Scherf's confessions were not voluntary and that the conditions were so severe that Scherf felt he could not continue without some relief.

The record, though, reveals that Scherf met with attorneys twice before his first interview with police. He met with attorney Neil Friedman again before he gave his third statement to police. The State also notes that Detectives Brad Walvatne and Dave Bilyeu repeatedly advised Scherf of his *Miranda* rights. When Scherf spoke to them, they never made any threats or promises to him. In addition, the trial court found that Scherf was not suicidal; he appeared organized, reality based, and not disturbed; and he was generally functioning within normal limits. He was calm and cooperative. The interviews were conducted on Scherf's terms, with him answering some questions but not others. Dr. Grassian noted that another reason Scherf confessed was because he was hating himself for what he had done. Dr. Grassian testified, "He clearly said, I mean, you know, I deserve to die; there's nothing, there's no other punishment that is appropriate; I need to die." Verbatim Report of Proceedings (VRP) (May 8, 2012) at 1000. Dr. Grassian also testified

that he believed that Scherf had confessed to a prior rape and assault because of the intolerable guilt, not as a result of the conditions of confinement.

Even assuming the conditions at WSR and the Snohomish County Jail were poor, the trial court found that the conditions were necessary due to health concerns for Scherf and were for a limited amount of time. A county mental health professional examined Scherf and opined that although he was not suicidal at that time, she believed some restrictions would be appropriate due to safety concerns. Once it was determined that Scherf was not a risk of harming himself, the restrictions were relaxed. Because Scherf was informed of his *Miranda* rights numerous times, he spoke to counsel before giving the videotaped statements, and several witnesses testified that he confessed due to his feelings of guilt, we conclude that the conditions of his confinement did not render his statements involuntary.

B. Unreasonable Delay

Scherf next argues that he was not brought before a court until 22 days after he was detained. If unnecessary delay in the preliminary appearance occurs, statements given by the accused are not automatically excluded. Instead, the court considers the delay as one of the factors to be taken into consideration in determining whether the confession was involuntary. *Hoffman,* 64 Wn.2d at 450.

Here, Scherf was not detained for the crime of murder until he was booked on February 23, 2011, as discussed *supra*. He was brought before a court the next day. Therefore, no unreasonable delay occurred.

C. Interference with Right to Counsel

Scherf next argues that his right to counsel was violated and that the State exploited the circumstances of his confinement to circumvent his right to counsel. The record establishes that Scherf's first request for an attorney occurred at 9:00 p.m. on January 29, 2011. Detective Robinson was in the process of getting a search warrant. As soon as Detective Robinson returned the next morning, he immediately contacted a public defender, and Scherf was provided with an attorney as soon as practicable. We conclude that Scherf's right to counsel was not interfered with or otherwise violated.

D. Improper Confinement

Scherf argues that he was unlawfully transferred to the Snohomish County Jail in violation of RCW 72.68.040 and .050. As already discussed *supra*, Scherf was not improperly held at the Snohomish County Jail, and, at best, improper confinement at the Snohomish County Jail is a factor in assessing whether his videotaped statements were voluntary. Under the totality of the circumstances, we conclude that Scherf's videotaped statements were voluntary.

We affirm the trial court's denial of Scherf's motion to suppress and its holding that (1) Scherf was not was denied access to counsel, (2) he was not held unlawfully in the Snohomish County Jail, (3) he was not denied due process by the prosecutor's failure to bring him promptly before the court, and (4) his statements were voluntary under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

*Did the trial court err by failing to redact portions of Scherf's videotaped statements and admitting his "kite"?*

<u>Statements regarding A&D Ointment, Shoelaces, and Cartoon</u>

Scherf asserts the trial court erred when it refused to redact his videotaped statements regarding the A&D ointment and shoelaces found in the sanctuary and the cartoon he provided Officer Biendl because these statements confused the issues, misled the jury, or were unfairly prejudicial.

Generally, a party may assign error on appeal only on the specific ground of the evidentiary objection made at trial. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). The State asserts that Scherf waived this issue because, at trial, he objected to the statements regarding the ointment, shoelaces, and the cartoon on the basis that they were "not relevant" generally, VRP (Jan. 16, 2013) at 1606, and only now argues the evidence should have been redacted under ER 403. Scherf argues that the issue was not waived because when a court considers whether evidence is relevant, it must always conduct an ER 403 inquiry.

ER 403 does not control whether evidence is relevant. "Relevant evidence" is defined under ER 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," and its general admissibility is defined under ER 402. ER 403, on the other hand, limits the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." It appears that the objection raised at trial by the defense as to the ointment and the shoelaces was based on the grounds that those statements did not tend to make the existence of any fact more or less probable. It also appears that the defense objected to the introduction of the statements pertaining to the cartoon as "prejudicial," but when pressed by the trial court, submitted that ER 401 is "the only objection the defense ha[d]." VRP (Jan. 16, 2013) at 1614.

Therefore, when Scherf objected to the evidence on general relevancy grounds per ER 401, the trial court properly conducted an ER 401 analysis. It was not also required to conduct an ER 403 analysis when Scherf failed to raise the issue explicitly at trial. Because analyses under ER 401 and 403 are distinct, Scherf waived the issue when he did not object on the proper grounds at trial.

38

Even if we were to assume, without deciding, that the evidence in question was properly challenged under ER 403, no error occurred. A trial court's rulings on relevance and its prejudicial effect under ER 402 and 403 are reviewed for abuse of discretion. *State v. Anderson*, 44 Wn. App. 644, 652, 723 P.2d 464 (1986). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

Here, Scherf argues that the evidence is inadmissible under an ER 403 analysis. Under this analysis, we must first determine whether the trial court abused its discretion in its determination that the evidence was relevant. The trial court held that the evidence was relevant to show that Scherf was present in the chapel during the murder and that Scherf knew Officer Biendl previously. Because the threshold to admit relevant evidence is low, we conclude that the trial court did not act unreasonably in its determination.

Next, we must determine whether the evidence's probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Scherf first argues the evidence is unfairly prejudicial because it shows he disobeyed prison rules. Evidence is unfairly prejudicial when it is likely to stimulate an emotional response instead of a rational decision. *State v.*

*Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011). It is not inadmissible merely because it is harmful to the party opposing its admission. *State v. Read*, 100 Wn. App. 776, 782, 998 P.2d 897 (2000), *adhered to on remand*, 106 Wn. App. 138, 22 P.3d 300 (2001), *aff'd*, 147 Wn.2d 238, 53 P.3d 26 (2002). Here, the evidence—the shoelaces, the A&D ointment, and the cartoon—does not elicit an emotional response. The fact that the evidence demonstrates Scherf broke prison rules does not substantially outweigh the evidence's probative value.

Scherf also argues that the evidence confused the issues or misled the jury. Scherf generally states the evidence caused jurors to speculate about what he intended to use the evidence for or confused the jurors about what the evidence meant. However, as Scherf argued, these items could be satisfactorily explained:

> [H]e used the ointment and laces because of his running and hid them because he knew he would be searched when he was discovered at the chapel; these were not items he was allowed to have with him. He explained that the cartoon had been circulating around the prison for some time and Officer Biendl asked him for a copy of it.

Opening Br. of Appellant at 174. Furthermore, an ER 403 analysis requires the evidence's probative value to be *substantially* outweighed by the danger of confusion of the issues or misleading the jury. The mere fact that jurors could speculate about what the evidence is used for does meet this burden. Its probative value—that Scherf had previously been present in the chapel and knew Officer

Biendl—is not outweighed by the dangers enumerated in ER 403. The trial court

did not abuse its discretion.

Officer's Question regarding Murder

The defense objected to introduction of two questions by Detective

Walvatne as irrelevant and unfairly prejudicial because it demonstrated an opinion

that Scherf was guilty: (1) the detective's question about what Scherf would say of

Officer Biendl's death if she could hear him, and his response, "I don't wanna go

into that right now," VRP (Jan. 16, 2013) at 1615, and (2) the detective's question,

"You, you weren't sorry that she was dead?" VRP (Jan. 16, 2013) at 1620; CP at

1081, and his response,

> Not at that point in time. I don't believe that I was. I mean, when I,
> when I walked up to her and looked maybe I, I felt some . . . like I
> said, it was, it was just a weird experience. I can't explain it. It was
> like, real surreal. I mean, I just like, I don't know.

CP at 1081 (alteration in original). These questions were asked after Scherf waived

his rights and confessed to the murder of Officer Biendl. Scherf also objected to

the detective's reference of "the murder." VRP (Jan. 16, 2013) at 1654. The court

conducted an ER 403 balancing test and held that the first statement demonstrates

the police did not coerce Scherf and the second statement goes to Scherf's state of

mind. The court also determined that the statement by Detective Walvatne

referencing "the murder" was not substantially prejudicial because it "doesn't

really change or introduce" anything to the case. VRP (Jan. 16, 2013) at 1654, 1655.

A witness, lay or expert, may not testify about the defendant's guilt or innocence. *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). Such testimony "violates the defendant's right to a trial by an impartial jury and her right to have the jury make an independent evaluation of the facts." *State v. Sanders*, 66 Wn. App. 380, 387, 832 P.2d 1326 (1992). Scherf argues that the detective's questions "improperly conveyed the officers' opinion that Mr. Scherf was guilty of murdering Officer Biendl, [and the questions] were calculated to force him to respond to questions which assumed he was callous and unremorseful." Opening Br. of Appellant at 176. Because of this, he argues, the statements were inadmissible under ER 402 and ER 403. Yet, Officer Walvatne's questions did not express an opinion as to Scherf's guilt; they were follow-up questions to Scherf's confession that he murdered Officer Biendl. Because the trial court had tenable reasons to admit the statements and the prejudicial effect was low, Scherf's arguments are unavailing.

### Statements regarding Scherf's Constitutional Rights

Scherf argues that multiple admitted statements invited the jury to infer guilt based on his exercise of constitutional rights. These statements include:

42

(1) Detective Walvatne's statement, "Um, I have something that I need your help with regarding a speedy resolution of my case. It will not be a waste of your time." VRP (Jan. 16, 2013) at 1650.

(2) Scherf's statement, "Because ah, I did a lot of soul searching and um, it's just, you know, ah, she didn't deserve to die . . . so . . . the bible says if you take a life, you give a life. That's all I can say." VRP (Jan. 16, 2013) at 1634 (alteration in original); CP at 1091 (alteration in original).

(3) Scherf's statement, "I wanna be here. I, I chose to be here. Like I said. I think in the interest of, of this family that's ah, lost their loved one and um, everything considered that it's just, this thing just needs to be dealt with quickly." VRP (Jan 16, 2013) at 1646; CP at 1092.

(4) Detective Walvatne's statement, "And no disrespect to you know um, we just, we've been thinking about a lot of stuff. And it seems like you have a really you know you're very upset about what happened and we're trying to get all the facts and trying to get all the answers . . . for especially Officer Biendl's family." VRP (Jan. 16, 2013) at 1665-66.

(5) The "kite" Scherf wrote to the prosecutor asking to charge him with aggravated first degree murder and saying he would plead guilty at arraignment. Br. of Resp't at 118.

Scherf specifically argues that these statements focused on his failure to plead guilty and deal with the matter quickly because he was exercising his trial rights. These arguments fail.

The State may not draw adverse inferences on a defendant's exercise of his constitutional rights. *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). However, not all arguments that discuss a defendant's constitutional rights are impermissible. The question is "whether the prosecutor manifestly intended the remarks to be a comment on that right." *State v. Crane*, 116 Wn.2d 315, 331, 804

43

P.2d 10 (1991). In *Gregory*, the State argued why it was unlikely for the rape victim to put herself through a trial. The State did not criticize the defendant's cross-examination of the victim or comment on the defendant's decision to put the victim through a trial. The court held that the arguments were proper because they did not focus on the defendant's exercise of his constitutional rights—the argument merely focused on the credibility of the witness.

Similar to *Gregory*, the comments in this case do not focus on Scherf's exercise of his rights. The State offered these statements to demonstrate Scherf's reasoning for speaking with the police—they help demonstrate that the statements were voluntary and credible. The prosecutor never referenced Scherf's broken promise or the fact that he was putting Officer Biendl's family through a trial. Because the statements were not intended to comment on the exercise of Scherf's constitutional rights, the trial court did not err.

Scherf's Comments on Penalty

Scherf argues that the "kite," which includes Scherf's statement asking for the death sentence, was improperly admitted because it violated the Eighth Amendment. He argues that opinions regarding the appropriateness of the death penalty violate the Eighth Amendment under *State v. Pirtle*, 127 Wn.2d 628, 904

P.2d 245 (1995) and *Gregory*. However, as the State correctly points out, these cases deal with victim impact statements suggesting a certain penalty.

Here, Scherf's opinion regarding the appropriate sentence is not analogous to the opinion of a victim. A victim's statement could be emotionally charged and may elicit an emotional response. The same cannot be said for Scherf's statement. This statement, on the other hand, could likely demonstrate a sense of accountability and remorse. Because this case addresses Scherf's own statements, the kite's admission did not violate the Eighth Amendment.

### Scherf's Statement regarding Advice of Counsel

Scherf argues the trial court erred when it failed to redact his statements that he had met with an attorney, he was not listening to the advice of counsel, and he did not want counsel present during the taping session. He argues that the statements were unnecessary, misleading, and unfairly prejudicial under ER 403.[13]

As we have already discussed *supra*, generally, a party may assign error on appeal only on the ground of the objection made at trial. *Guloy*, 104 Wn.2d at 422. At trial, Scherf objected to this evidence because it was hearsay, irrelevant, more prejudicial than probative, and "somewhat" cumulative. Scherf did not object to the evidence on the grounds that it would mislead the jury, nor did he make this

---

[13] Although Scherf says the evidence was unfairly prejudicial, he did not brief the issue. Instead, the primary focus was whether the evidence would mislead the jury.

argument. The focus of the objection and the trial court's ruling was whether the evidence was relevant and prejudicial. Because Scherf did not object to the evidence on appropriate grounds at trial, he waived this challenge.

Even if we were to consider whether the evidence would mislead the jury, Scherf's arguments are unavailing. Scherf argues that the evidence was misleading because it created "the impression" that Scherf's right to counsel had been "respected, facilitated or preserved," even though police did not timely provide him access to counsel. Opening Br. of Appellant at 182. However, Scherf's statements demonstrate that (1) he spoke with counsel before giving these statements and (2) he was not overborne by the police. The statements were not misleading—they were an accurate representation of the facts. Here, Scherf spoke with counsel seven days before giving his statement to the police. Any delay Scherf points to in obtaining counsel was irrelevant in determining whether these statements were misleading. The statements establish Scherf spoke with counsel and that he was disregarding his attorney's advice. Because he spoke with an attorney twice before making these statements, they were an accurate representation of the facts and, thus, not misleading.

*Did the prosecutor engage in misconduct that deprived Scherf of a fair trial?*

A defendant alleging prosecutorial misconduct must prove (1) the conduct was improper and (2) he was prejudiced. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Prejudice is analyzed under two different standards. If a defendant timely objects, he "must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Emery*, 174 Wn.2d at 760. If a defendant fails to object, he must show the prosecutor's misconduct was so flagrant and ill intentioned that (1) "'no curative instruction would have obviated any prejudicial effect on the jury'" and (2) the resulting prejudice "'had a substantial likelihood of affecting the jury verdict.'" *Emery,* 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). We look at a prosecutor's comments in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

The Prosecutor Ingratiating Himself with Jurors

Scherf argues that the prosecutor took advantage of the seating arrangement in the courtroom by smiling and personally thanking prospective jurors after their individual voir dire. Scherf first objected to the prosecutor's conduct on April 5,

2013, after the voir dire of juror 17, who later sat on the jury. The court instructed the prosecutor to "keep it to a minimum, and just a glance or something of that nature." VRP (Apr. 5, 2013) at 3307. Scherf objected for a second time after the prosecutor made eye contact and smiled at juror 95. The court told the prosecutor he "need not do that anymore" and that it was "of course, unfair if, by [his] location in the courtroom, [he is] able to ingratiate [himself] with some jurors in a way that the defense cannot." VRP (Apr. 15, 2013) at 4455. The prosecutor responded that he had interacted this way only with jurors who were excused.

Scherf argues this contact was intended to forge a bond between the State and the jurors in a way defense counsel could not by virtue of the courtroom seating arrangement. Because this occurred after the voir dire of juror 83, Scherf argues that this means every juror before 83 received this treatment as well. The record simply does not support this assertion.

Private communications between prosecutors and jurors may invalidate the verdict unless the State proves that the communication was harmless. *Mattox v. United States*, 146 U.S. 140, 150, 13 S. Ct. 50, 36 L. Ed. 917 (1892). If the communication is merely de minimis, the defendant must show the communication was prejudicial, meaning "it raise[d] a risk of influencing the verdict," before the burden of proof shifts to the State. *Caliendo v. Warden of Cal. Men's Colony*, 365

F.3d 691, 696-97 (9th Cir. 2004). To determine whether a communication raises

the risk of influencing the verdict, we analyze five factors: (1) whether the

unauthorized communication concerned the case, (2) the length and nature of the

contact, (3) the identity and role at trial of the parties involved, (4) evidence of

actual impact on the juror, and (5) the possibility of eliminating prejudice through

a limiting instruction. *Caliendo*, 365 F.3d at 697-98. In weighing these factors, the

trial court's findings are entitled to some deference.

In *Caliendo,* the Ninth Circuit held a critical prosecution witness' 20-minute

conversation with multiple jurors, though unrelated to the case, was possibly

prejudicial, thus triggering the burden shift to the prosecution to show

harmlessness. In reversing the conviction, the Ninth Circuit noted that even though

the conversation was not relevant to the case, the incident went "beyond 'a mere

inadvertent or accidental contact involving only an exchange of greeting in order to

avoid an appearance of discourtesy.'" *Caliendo*, 365 F.3d at 698 (quoting *United*

*States v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir. 1966)).

Here, the prosecutor's conduct occurred during voir dire where counsel for

both sides had an opportunity to speak to the jury, so it was not unauthorized

communication. The communications, if we even characterize these actions as

such, were brief. Scherf has not presented evidence that such contact impacted

jurors. Also, the jurors were instructed to disregard any remark made by the attorneys not supported by the evidence and to "not let your emotions overcome your rational thought process." CP at 310. Scherf does not show that the prosecutor's smiling and thanking jurors raised the risk of influencing the verdict; any such contact was de minimis. The prosecutor's conduct did not deny Scherf a fair trial.

Reference To Finding Officer Biendl's Body Lying under a Cross

During opening statements, the prosecutor described the location of Officer Biendl's body: "And up on the stage, under the cross, they find Jayme Biendl, on her back, blood coming out of her mouth, dead." VRP (May 1, 2013) at 6004. Scherf did not object to this statement.

Scherf argues this statement appealed to the passions and prejudices of the jury because it likened Officer Biendl to a Christ figure. A prosecutor's appeal to the jury's "'passion and prejudice, as well as prejudicial allusions to matters outside the evidence, are inappropriate.'" *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988) (quoting *State v. Belgarde*, 46 Wn. App. 441, 448, 730 P.2d 746 (1986)). To prevail on his misconduct claim, Scherf must first show this conduct was improper. Second, because Scherf failed to object at trial, he must show the alleged misconduct was so flagrant and ill intentioned that (1) "'no

curative instruction would have obviated any prejudicial effect on the jury'" and (2) the resulting prejudice "'had a substantial likelihood of affecting the jury verdict.'" *Emery,* 174 Wn.2d at 760 (quoting *Thorgerson,* 172 Wn.2d at 455).

Here, Scherf does not show the prosecutor's comment was improper nor does he demonstrate that, even assuming misconduct, a curative instruction would not have cured the alleged prejudice. The statement that Officer Biendl was found under a cross was a fact of the case the prosecutor was entitled to use when painting a picture of events for the jury. Nothing else in the prosecutor's opening statements suggests this statement was meant to evoke religious sentiment in the minds of the jurors; it is mere speculation to say that the statement was a deliberate reference to Christ. The statements were not misconduct, nor were they flagrant and ill intentioned.

Statement of the Law on Premeditation

Scherf argues that the prosecutor misstated the law on premeditation in that the prosecutor argued that intent to kill proves premeditation even though they are two separate elements of the crime. Scherf points to three parts of closing argument he alleges were improper:

> The law says premeditation must involve more than a moment in time. All the law requires is ". . . some time, however long or short, in which a design to kill is deliberately formed."

51

VRP (May 9, 2013) at 6898 (alteration in original).

> Mr. Scott just tried to argue to you, that premeditation means a step-by-step plan.
>
> It doesn't. It requires ". . . more than a moment in point of time."
>
> "When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated."
>
> It doesn't say when you form the intent that you've got to go buy the insurance policy, or when you're going to go dig the grave, or when you're going to . . . go get the cord, or you're going to draw a noose. No, it's not in there. What it says is, once you have formed the intent, ". . . the killing may follow immediately after the formation of the settled purpose."
>
> . . . .
>
> . . . The decision to be made, the premeditation, the stewing that took place; that was done. Maybe I'll beat her up. No, not good enough. I'm going to kill her. The decision is when it was. At what point—at what point—was that weapon, the strength in his hands, the anger or the hate in his heart, at what point was the weapon locked and loaded?

VRP (May 9, 2013) at 6936-37 (first and third alterations in original).

> [I]f you have an abiding belief that when he walked through that sanctuary door he was going to kill her, you are satisfied beyond a reasonable doubt that he had premeditated in his design to kill her.

VRP (May 9, 2013) at 6941.

Scherf did not object at trial. Thus, Scherf must first show this conduct was improper and then that the alleged misconduct was so flagrant and ill intentioned that (1) "'no curative instruction would have obviated any prejudicial effect on the

jury'" and (2) the resulting prejudice "'had a substantial likelihood of affecting the jury verdict.'" *Emery,* 174 Wn.2d at 760 (quoting *Thorgerson,* 172 Wn.2d at 455). Scherf does not meet this burden because the prosecutor did not misstate the law.

Premeditation is "'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short'"—it is more than a moment in time. *State v. Bingham,* 105 Wn.2d 820, 823, 719 P.2d 109 (1986) (quoting *State v. Brooks,* 97 Wn.2d 873, 876, 651 P.2d 217 (1982)). We have previously held that there is sufficient evidence of premeditation where (1) there were multiple wounds, (2) the defendant brought a weapon to the murder site, (3) there was a sufficient lapse of time, (4) there was evidence of motive, and (5) there was planning and preparation. *State v. Gentry,* 125 Wn.2d 570, 598, 888 P.2d 1105 (1995).

Although Scherf argues the prosecutor's statements conflated intent to kill and premeditation, the statements must be placed in the context of the prosecutor's entire closing argument. In the first statement by the prosecutor, he quoted the second half of the premeditation jury instruction, then segued into discussing Scherf's deliberation. The prosecutor recapped the evidence that demonstrated a plan and deliberation—how Scherf acted to ensure there would be no witnesses or cameras, how he stalled for time, how he checked to see if the guard for the area

was not around, how he closed the gate, how he first grabbed Officer Biendl's

microphone away from her, and how Officer Biendl fought back. The prosecutor's

presentation of the evidence was proper support for his argument of premeditation.

As for the second and third statements, the prosecutor in rebuttal was

responding to the defense's argument that a step-by-step, elaborate plan was

needed to demonstrate premeditation. The prosecutor rebutted that argument and

discussed the evidence demonstrating Scherf's plan to kill Officer Biendl,

reiterating all of the "the steps he had to take to orchestrate that plan." VRP (May

9, 2013) at 6937.

When looking at the prosecutor's closing argument as a whole, he did not

conflate intent to kill with premeditation. Instead, he presented a cohesive

chronology of events detailing Scherf's preparation to carry out Officer Biendl's

murder. Scherf's arguments are unpersuasive; we find no error in the prosecutor's

presentation to the jury of the law on premeditation.

*Did the trial court err in refusing to give defense proposed instructions?*

Scherf argues the trial court erred when it refused to give his proposed

premeditation instruction and instead gave the standard Washington Pattern Jury

Instructions defining "premeditation." 11 *Washington Practice: Washington*

*Pattern Jury Instructions: Criminal* 26.01.01, at 382 (4th ed. 2016) (WPIC) reads:

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

Scherf proposed a supplemental definition of premeditation be added to the WPIC:

> Premeditation is the deliberate formation of and reflection upon the intent to take a human life. It is the mental process of thinking beforehand, deliberation, reflection, and weighing or reasoning for a period of time, however short.

CP at 339. Scherf argued his definition drew a clearer distinction between intent to kill and premeditation. The trial court denied his request, reasoning that the standard instruction allows the defense to argue its theory of the case and the undefined term "reflect" may confuse the jury. VRP (May 8, 2013) at 6825-26.

"Parties are entitled to instructions that, when taken as a whole, properly instruct the jury on the applicable law, are not misleading, and allow each party the opportunity to argue their theory of the case." *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003) (citing *State v. Mark*, 94 Wn.2d 520, 526, 618 P.2d 73 (1980)). A trial court may refuse an instruction if it is collateral to or repetitious of an instruction already given, in the context of all the instructions. *Brown*, 132 Wn.2d at 618. A trial court's refusal to give a jury instruction is reviewed for abuse of discretion if it is based on a factual determination. *State v. Walker*, 136 Wn.2d

767, 771-72, 966 P.2d 883 (1998). It is reviewed de novo if it is based on a legal conclusion.

Here, the trial court did not err in refusing Scherf's proposed instruction. Our cases have consistently held that the standard jury instruction for premeditation makes it "abundantly clear" that intent is not synonymous with premeditation and any challenge on that basis fails. *State v. Rice*, 110 Wn.2d 577, 603-04, 757 P.2d 889 (1988); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 317, 868 P.2d 835 (1994). The standard WPIC accurately states the applicable law—it defines premeditation as more than intent and requires at least some deliberation. WPIC 26.01.01 ("[w]hen a person, after any deliberation, forms an intent to take human life"). The trial court gave a separate instruction defining intent: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." CP at 316. These instructions sufficiently distinguished intent and premeditation and allowed Scherf to argue his theory of the case. The trial court did not err in instructing the jury.

*Did cumulative error deny Scherf a fair trial?*

Scherf asserts that he was denied a right to a fair trial under the cumulative error doctrine. The question is whether, under the totality of the circumstances, a combination of errors substantially prejudiced Scherf and denied him a fair trial. *In*

*re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). Because

Scherf fails to show any error, he does not establish an accumulation of error.

Conclusion

We affirm the conviction, vacate the sentence, and remand for imposition of

a life without parole sentence.

WE CONCUR:

No. 88906-6

GONZÁLEZ, J. (concurring)—I reluctantly join the majority's vacation of Byron Scherf's death sentence. Scherf has shown no error in his case justifying reversal. However, I acknowledge that *State v. Gregory* controls. No. 88086-7 (Wash. Oct. 11, 2018), http://www.courts.wa.gov/opinions/pdf/880867.pdf. I stress that *Gregory* controls only because it held our death penalty statutes are facially unconstitutional, not as applied. *Id.* at 19. But for the sweeping holding of *Gregory*, Scherf could not show the death penalty was unconstitutional as applied to him.

*Gregory* was predicated on compelling evidence that "black defendants were four and a half times more likely to be sentenced to death than similarly situated white defendants." *Id.* at 11 (citing KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014, at 31-33 (Oct. 13, 2014)). A system of justice that administers the death penalty in a manner that is arbitrary and applied unequally based on race cannot withstand constitutional scrutiny. Not affording the same relief to Scherf as Gregory would violate basic principles of equal protection under the law, even though Scherf has shown no prejudice from the racial discrimination that has resulted in the mercy he gets today. Scherf has not demonstrated that he deserves such mercy. But since *Gregory* controls, I concur.

González, Jr., J.